# EXHIBIT G

**CINTAS CORPORATION**

**EMPLOYMENT ARBITRATION AGREEMENT**

1.      The Company[1] and I enter into this Employment Arbitration Agreement ("Agreement"). Except as stated herein, the Company and I mutually agree to give up our respective rights to trial by jury. The Company and I agree to use binding arbitration as the sole means to resolve all disputes that may arise out of or relate to my application for employment or employment with the Company, including termination of employment. *Please note that if this Agreement and a collective bargaining agreement cover a dispute or disputes, the collective bargaining agreement will prevail for those union employees subject to it*.

2.      The Company and I each waive our respective rights to bring a claim against the other in court, and this waiver will be equally binding on any person who represents the Company or me in a lawsuit against the other in court. Except as stated herein, the Company and I agree to submit any claim, dispute, and/or controversy against the other to binding arbitration under the Federal Arbitration Act (FAA).

3.      The Company and I agree the FAA applies to this Agreement. The Company and I expressly incorporate the terms of the FAA into this Agreement and agree they apply, including the procedural and substantive rules of the FAA.

4.      The Company and I agree the scope of this Agreement includes all disputes, whether based on tort, contract, or statute. This includes claims alleging violation of wage and hour laws, and any claims of discrimination, harassment and/or retaliation, whether they are based on any state or federal law or regulation, equitable law, or otherwise. However, this Agreement does not cover claims for sexual harassment or sexual assault arising on or after March 3, 2022; administrative claims arising under the National Labor Relations Act that must be brought before the National Labor Relations Board; or other claims that cannot be arbitrated as a matter of law, but only when the arbitrability of such claims is not preempted by the FAA. This Agreement does not prevent me from filing and pursuing administrative proceedings before the United States Equal Employment Opportunity Commission or state equivalent. However, if I pursue a claim following the exhaustion of such administrative remedies, that claim would be subject to this Agreement.

5.      **This Section Applies to California Employees Only.** This Agreement also does not prevent me from filing and pursuing administrative proceedings before the California Department of Industrial Relations, Labor Commissioner's Office, under Labor Code Section 98. However, if the Company or I wish to seek review of the Labor Commissioner's order, that claim would be subject to this Agreement.

6.      The Company and I agree that arbitration is the exclusive remedy for all disputes covered by this Agreement.

7.      The Company and I intend for this Agreement to allow for individual arbitration of disputes and claims to the maximum extent possible. The Company and I will arbitrate all disputes subject to this Agreement in an individual capacity.

8.      The Company and I agree that any non-arbitrable disputes or claims will be severed, separated, and split from arbitrable disputes or claims to ensure enforcement of this Agreement as to any disputes subject to arbitration.

9.      If a party brings claims subject to this Agreement along with non-arbitrable claims, the Company and I agree to stay the non-arbitrable claims pending arbitration of the claims subject to this Agreement.

10.     **Class and Collective Action Waiver.** *The Company and I agree this Agreement eliminates my ability to bring or participate in class or collective actions*. No court or arbitrator has the authority to construe this Agreement to allow or permit the consolidation or joinder of other claims or controversies involving any other employees in arbitration or permit such claims or controversies to proceed as a class or collective action. By signing this Agreement, I agree to waive any substantive or procedural rights I may have to sue on a class or collective basis.

11.     **This Section Applies to California Employees Only.** To the extent allowable under applicable law, I agree to arbitrate any claims, the Company's defenses to such claims, or any disputes related to California Labor Code

---

[1]Cintas Corporation is my employer and referred to herein as "the Company." Although this Agreement is between the Company and me, I understand and agree it is for my benefit and the benefit of the Company, its affiliates, subsidiaries or parents, and any alleged joint-employer, alter ego, or agent of my employer.

violations I allegedly suffered, including claims, defenses, and disputes arising out of or related to California's Private Attorneys General Act of 2004 (PAGA), on an individual basis. No arbitrator will have the authority under this Agreement to arbitrate claims, defenses, or disputes related to Labor Code violations allegedly suffered by non-parties to this Agreement. If a court compels arbitration of individual claims, defenses, or disputes arising out of or related to PAGA, the Company and I agree the court should dismiss any non-individual, representative claims or disputes related to Labor Code violations allegedly suffered by non-parties to this Agreement, to the extent allowable under applicable law. If dismissal of claims related to Labor Code violations allegedly suffered by non-parties to this Agreement is not allowable under applicable law, the Company and I agree to stay such claims pending any arbitration of individual claims, defenses, or disputes arising out of or related to PAGA.

12.     The Company and I agree that a court of competent jurisdiction will be the sole determiner of any disputes regarding whether the FAA applies to this Agreement, whether the Agreement requires individual arbitration of all claims, and whether the Agreement allows for class or collective arbitration. A court of competent jurisdiction will decide all issues about the enforceability of the class or collective waivers herein. The arbitrator has no authority or jurisdiction regarding these issues. If a court enforces the class and collective waiver herein, the Company and I agree the court should also dismiss any class and/or collective claims without prejudice, to the extent allowable under applicable law.

13.     Except as stated in Paragraph 12 above, the parties agree that all other disputes between them, including without limitation, disputes concerning formation or enforceability of this Agreement, are delegated to the Arbitrator who shall have exclusive authority to resolve such disputes.

14.     If a court determines the prohibition on class or collective actions, or the requirement to arbitrate PAGA claims on an individual basis as set forth above are invalid, the Company and I waive any right to arbitration of class or collective actions, or PAGA actions involving alleged Labor Code violations suffered by non-parties. Instead, the Company and I agree that such claims will proceed in court and not before an arbitrator, but only after the Company and I arbitrate any claims subject to this Agreement. Note: if a court determines the prohibition on class actions only is invalid, the prohibition on collective actions and requirement to arbitrate PAGA claims on an individual basis remain in effect. Likewise, if a court determines the prohibition on collective actions only is invalid, the prohibition on class actions and requirement to arbitrate PAGA claims on an individual basis remain in effect. Finally, if a court determines the requirement to arbitrate PAGA claims on an individual basis only is invalid, the prohibition on class and collective actions remain in effect.

15.     I understand this Agreement does not interfere with the right to collectively bargain, to engage in protected, concerted activity, or to exercise other rights protected under the National Labor Relations Act.

16.     Besides any other requirements imposed by law, the arbitrator selected will be a retired judge or an otherwise qualified individual to whom the Company and I agree, and will be subject to disqualification on the same grounds as would apply to a judge of such court. If the Company and I cannot agree upon an arbitrator, a court of competent jurisdiction may appoint one. The arbitrator will also have the immunity of a judicial officer from civil liability when acting in the capacity of an arbitrator, which immunity supplements any other existing immunity. The arbitrator shall have the authority to issue subpoenas to compel the production of documents, and the attendance of witnesses at deposition or the arbitration hearing. The arbitrator shall base resolution of all disputes solely upon the law governing the claims and defenses pleaded. The arbitrator may not invoke any basis (including but not limited to, notions of "just cause") other than such controlling law. Awards shall include the arbitrator's written reasoned opinion.

17.     **This Section Applies to Employees Outside of California.** All federal rules of pleading (including the right to file a motion to dismiss), all federal rules of evidence, all rights to resolution of the dispute by means of summary judgment, judgment on the pleadings, and directed judgment or non-suit shall apply and be observed.

18.     **This Section Applies to California Employees Only.** All California rules of pleading (including the right of demurrer), all rules of evidence, all rights to resolution of the dispute by means of motions for summary judgment, judgment on the pleadings, and judgment under Code of Civil Procedure Section 631.8 will apply and be observed. The Company and I also agree all rights under Code of Civil Procedure Section 998 apply.

19.     The Company and I stipulate and agree that the Company may pay arbitration invoices 60 days following its receipt of an invoice if no due date is stated, and 60 days following the due date stated in the invoice if a due date is stated.

20.    The Company and I agree that the terms of this Agreement are the complete and final agreement. No negotiations, oral or written representations, alter this Agreement or vary its terms. The Company and I agree only a signed, written agreement can modify this Agreement.

21.    If a court finds any word, term, phrase, sentence, provision, or portion of this Agreement void or unenforceable, the Company and I agree the court should sever the word, term, phrase, provision, or portion and enforce the remainder of this Agreement to the fullest extent necessary to allow for arbitration of claims, defenses, or disputes on an individual basis only.

22.    If an appeal arises from a court ruling regarding motion/petition to compel individual arbitration under this Agreement, the Company and I agree to stay the underlying action pending the completion of the appeal in accordance with the FAA.

23.    The Company and I agree to hold the arbitration in the county in which the claims arose, or in the county in which I primarily reside, whichever is most convenient for the Company and me. If the Company and I cannot agree on the local venue, the arbitrator can determine the local venue in accordance with applicable law or arbitration rules.

24.    The Company and I agree this Agreement is mutually beneficial. The Company and I also agree such mutuality constitutes sufficient legal consideration to make all obligations agreed to herein enforceable under law.

25.    If the Company and I have agreed to any prior arbitration agreement, that agreement remains in effect. The Company and I agree this Agreement does not invalidate or supersede any prior arbitration agreement. However, the terms of this Agreement control to the extent there are any conflicting terms in any prior arbitration agreement.

26.    **Electronic Signature.** Employee agrees that the Company may enforce this Agreement with a copy for which Employee has provided an electronic signature, and that such electronic signature may be satisfied by procedures that the Company or a third party designated by the Company has established or may establish for an electronic signature system, and Employee's electronic signature shall be the same as, and shall have the same force and effect as, Employee's written signature. By electronically accepting this Agreement, Employee agrees to the following: "This electronic contract contains Employee's electronic signature, which I have executed with the intent to sign this Agreement."

**I AGREE AND ASSENT TO THE TERMS OF THIS AGREEMENT. I AGREE IT IS UNNECESSARY FOR THE COMPANY TO SIGN THIS AGREEMENT FOR IT TO BE BINDING.**

Name:          Tatum Garrity

Signature:     Tatum Garrity

Date:          September 2, 2025

Location:      0470 MINNEAPOLIS MN RNTL

**CINTAS CORPORATION**

**EMPLOYMENT PROTECTIVE AGREEMENT**

This Protective Agreement ("**Agreement**") is made by and between Cintas Corporation and its parents, subsidiaries, business units, affiliates, predecessors, successors and assigns (the "**Company**") and the undersigned individual ("**Employee**").

**WHEREAS**, the Company and Employee agree that the Company has a legitimate business interest in, among other things, its Confidential Information (defined below) and Trade Secrets (defined below), and in the significant time, money, training, team building and other efforts it expends to develop Employee's skills to assist Employee in performing Employee's duties for the Company, including with respect to establishing, developing and maintaining the goodwill and business relationships with the Company's customers and employees, all of which Employee agrees are valuable assets of the Company to which it has devoted substantial resources;

**WHEREAS**, the Company and Employee agree that the Company's Confidential Information and Trade Secrets, including key information about, and goodwill in, its customers and employees are not generally known to the public, were developed over time and at significant cost to the Company, and are the subject of reasonable efforts of protection by the Company against disclosure to unauthorized parties;

**WHEREAS**, as part of performing Employee's responsibilities for the Company, Employee will have access to and/or will use the Company's Confidential Information and Trade Secrets and will work with customers and employees; and

**WHEREAS**, the Company and Employee agree that this Agreement is reasonable to protect the Company against the irreparable harm it would suffer if Employee left the Company's employment (for any reason) and used or disclosed its Confidential Information and Trade Secrets, and/or interfered with the goodwill and relationships the Company has in its customers and employees.

**NOW, THEREFORE**, for good and valuable consideration, to which Employee would not otherwise be entitled without entering into this Agreement, including: (a) the promises and covenants contained in this Agreement; (b) Employee's employment or continued employment with the Company; (c) Employee's access to and use of the Company's Confidential Information and Trade Secrets, including key information about, and goodwill in, its customers and employees; (d) the specialized training the Company provides to Employee to allow Employee to perform Employee's duties for the Company; and/or:

(e)  (___)     Employee's bona fide hire;

(f)  (___)     Employee's bona fide promotion;

(g)  ( ✓ )     Employee's receipt of increased compensation; or

(h)  (___)     Employee's receipt of additional or improved fringe benefit of _____
_____;

the Company and Employee agree as follows (including the foregoing recitals which are expressly incorporated in this Agreement):

1.     **Duty of Loyalty, Compliance, Disclosures**.

1.1     <u>Duty of Loyalty During Employment</u>. During Employee's employment by the Company, Employee shall not, directly or Indirectly, without the Company's express written consent, engage in any employment or business activity which is competitive with, or would otherwise conflict with, Employee's employment by the Company.

1.2     <u>Compliance</u>. During Employee's employment by the Company, Employee agrees to abide by the Company's published policies, as amended from time-to-time at the Company's sole discretion; and for which copies have been made available to Employee.

1.3     I will comply with all Company policies, including but not limited to policies relating to the use of the Internet and the use of Company equipment and facilities.

1.4     <u>Disclosures</u>. In order to maintain Employee's confidentiality obligations and to avoid conflicts of interest which may arise, Employee will disclose (and allow the Company to disclose) to any future prospective employers the existence of this Agreement and the nature of Employee's confidentiality and restrictive covenant obligations arising from it before Employee accepts any new position of employment. At the Company's request, Employee must disclose to the Company the name and location of Employee's new employer, as well as Employee's anticipated job title and responsibilities for such new employer.

2.     **Definitions**.

2.1     "**Business**" means any activities, products, processes, systems or services (in existence or under development) of the Company during the two (2) years prior to the Last Day (as defined below). Specifically, the term "Business" includes (through the Company and through its Business Units) providing a range of products and services to businesses including uniforms, mats, mops, cleaning and restroom supplies, first aid and safety products, fire protection products and services, including extinguishers and testing, and safety courses. "Business Units" means the individualized business brands and product segments the Company establishes, maintains and amends from time to time.

2.2     "**Confidential Information**" means any non-public knowledge, data, or information – in tangible, intangible, or any other form – that is created by, used in or related to the Company's actual or anticipated business, products, research or development, or to the Company's technical data, Trade Secrets, or know-how, including but not limited to: business and strategic plans, methodologies and methods of doing business; software programs and subroutines, computer source and object code, algorithms and technology; data and databases; passwords; improvements; ideas; discoveries; hardware configuration information; developments; designs; product formulas; research and development; new product plans; the Company's confidential records pertaining to its existing or potential customers, including key customer contact information, customer agreements, contract terms and related information, like preferences, specific quotes or pricing, and product specifications; sources of supply; confidential business opportunities; expansion, merger or acquisition activity (including targets, opportunities, or prospects); confidential information regarding suppliers or vendors, including key supplier or vendor contact information, contract terms and related information, including supplier and sourcing information; strategies for advertising and marketing (including e-commerce); confidential business processes and strategies, including training, policies and procedures; financial and revenue data and reports, including gross revenue, profits (including margins), pricing, quoting and billing methods, and costs (including margins); and any other business information that the Company maintains as confidential. Employee specifically understands and agrees that the term Confidential Information also includes (a) other information that is marked confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary; or (b) all confidential information of third parties that may be communicated to, acquired by, learned of, or developed by Employee in the course of or as a result of Employee's employment with the Company or to which the Company has confidentiality obligations or use restrictions. Confidential Information does not include information that is or may become known to Employee or to the public from sources outside the Company and through means other than a breach of this Agreement or disclosed by Employee after written approval from the Company.

US EA 2 Rev. 7.30.2024

2.3 "**Competitive Product or Service**" means any product, process, system or service (in existence or under development) of any person or organization other than the Company that is the same as, similar to, or competes with the Business and upon which Employee worked or had responsibilities at the Company during the twenty-four (24) months prior to the Last Day (as defined below).

2.4 "**Competitor**" means Employee or any other person or organization engaged in or planning to engage in, research or development, production, marketing, leasing, selling, or servicing of a Competitive Product or Service. The term "Competitor" includes companies performing contract and/or expense management services for the Company's customers or potential customers, including but not limited to Fine Tune and Valicom.

2.5 "**Customer**" means any person(s) or organization to whom or which, within twenty-four (24) months prior to the Last Day, Employee, directly or Indirectly: (a) provided products or services in connection with the Business; or (b) provided written proposals about products or services in connection with the Business.

2.6 "**Indirectly**" means assisting or working with any third person(s) or entity(ies), either personally or through the supervision of employees, including the supervision of the selling or solicitation of products or services.  For Employees in North Carolina (or in any other jurisdiction that rejects the term "indirectly"), "Indirectly" as used throughout this Agreement shall exclusively mean "directly."

2.7 "**Last Day**" means Employee's last day of employment with the Company regardless of the reason for Employee's separation, including voluntary and involuntary.

2.8 "**Material Responsibilities**" means Employee's primary job duties and responsibilities, including in connection with supervising others.

2.9 "**Restricted Geographic Area**" means Employee's assigned territory(ies) where Employee performed or directed Material Responsibilities within the twenty-four (24) months prior to the Last Day. In the absence of an assigned territory, the Restricted Geographic Area shall be the (i) state(s), (ii) county(ies), or (iii) city(ies) (or portions thereof) where, during the twenty-four (24) months prior to the Last Day, Employee directly or Indirectly: (a) had Material Responsibilities or performed services on behalf of the Company; or (b) solicited Customers or otherwise sold products or services on behalf of the Company. If Employee performed Material Responsibilities that are not geographically limited to any territory but Employee's knowledge of the Company's Confidential Information and Trade Secrets could be used by a Competitor to unfairly compete with or undermine the Company's legitimate business interests, the Restricted Geographic Area shall be anywhere the Company does business.

2.10 "**Restricted Period**" means Employee's employment with the Company (other than on the Company's behalf) and a period of twelve (12) months after the Last Day. Employee recognizes that this durational term is reasonably and narrowly tailored to the Company's legitimate business interest and need for protection with each position Employee holds at the Company.

2.11 "**Trade Secret**" means information defined as a trade secret under applicable state law or the Defend Trade Secrets Act of 2016.

3. <u>**Restrictive Covenants**</u>. To protect the Company's legitimate business interests, including with respect to Employee's access to and use of the Company's Confidential Information and Trade Secrets, including key information about, and goodwill in, its customers, employees vendors and suppliers, Employee agrees that:

3.1     <u>Non-Competition</u>. During the Restricted Period and within the Restricted Geographic Area, Employee shall not, directly or Indirectly, perform Material Responsibilities in connection with a Competitive Product or Service. Notwithstanding the foregoing, Employee may accept employment with a Competitor whose business is diversified, provided that: (a) Employee will not be engaged in working on or providing Competitive Products or Services or otherwise use or disclose Confidential Information or Trade Secrets; and (b) the Company receives prior written assurances from the Competitor and Employee that are satisfactory to the Company that Employee will not work on or provide Competitive Products or Services, or otherwise use or disclose Confidential Information or Trade Secrets. In addition, nothing in this Agreement is intended to prevent Employee from investing Employee's funds in securities of a person engaged in a business that is directly competitive with the Company if the securities of such a person are listed for trading on a registered securities exchange or actively traded in an over-the-counter market and Employee's holdings represent less than one percent (1%) of the total number of outstanding shares or principal amount of the securities of such a person.

3.2     <u>Non-Solicitation and Non-Inducement of Customers</u>. During the Restricted Period and in connection with a Competitive Product or Service, Employee shall not directly or Indirectly: (a) solicit or refer (or attempt to solicit or refer) any Customer to a Competitor; and/or (b) induce or encourage (or attempt to induce or encourage) any Customer to terminate a relationship with the Company or otherwise to cease accepting services or products from the Company.

3.3     <u>Non-Solicitation and Non-Inducement of Employees</u>. During the Restricted Period, Employee shall not directly or indirectly (*e.g.*, through others) solicit or encourage (or attempt to solicit or encourage) any employees with whom Employee had business contact at the Company during the two (2) years prior to the Last Day to leave the Company's employment.

3.4     <u>Non-Interference with Vendors and Suppliers</u>. During the Restricted Period, Employee shall not directly or Indirectly interfere with the Company's relationships with its vendors or suppliers in any way that would impair the Company's relationship with such vendors or suppliers, including by reducing, diminishing or otherwise restricting the flow of supplies, services or goods from the vendors or suppliers to the Company.

3.5     <u>Covenants are Reasonable</u>. Employee acknowledges and agrees that: (a) the covenants in this section (i) are necessary and essential to protect the Company's Confidential Information, Trade Secrets and the goodwill in its customers and employees; (ii) the area, duration and scope of the covenants are reasonable and necessary to protect the Company; (iii) do not unduly oppress or restrict Employee's ability to earn a livelihood in Employee's chosen profession; (iv) are not an undue restraint on Employee's trade or any of the public interests that may be involved; (b) good and valuable consideration exists for Employee's agreement to be bound by the covenants in this section; and (c) the Company has a legitimate business purpose in requiring Employee to abide by the covenants set forth in this section.

3.6     <u>General Exceptions</u>. Employee understands that the restrictive covenant obligations in this section shall not apply to Employee if Employee is covered under applicable federal law, state statute or local ordinance/rule prohibiting non-competes or non-solicits, including on the basis of Employee's income or profession.

4.     **<u>Confidential Information and Trade Secrets</u>**.

4.1     <u>Access and Use</u>. Employee acknowledges and agrees that, by virtue of Employee's employment with the Company and exercise of Employee's duties for the Company, Employee will have access to and will use certain Confidential Information and Trade Secrets, and that such Confidential Information and Trade Secrets constitute confidential and proprietary Business

information and/or Trade Secrets of the Company, all of which are the Company's exclusive property and in which the Company invests considerable effort, time and money to establish and improve. Accordingly, Employee agrees that, except exclusively on behalf of the Company, Employee shall not, and shall not permit any other person or entity to, directly or Indirectly, without the prior written consent of the Company: (a) use Confidential Information or Trade Secrets for the benefit of any person or entity other than the Company; (b) remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information or Trade Secrets, except as required to perform responsibilities for the Company; (c) load, install, copy, store, or otherwise retain any Confidential Information on any non-Company computer or other device; and (d) while employed and thereafter, publish, release, disclose, deliver or otherwise make available to any third party any Confidential Information or Trade Secrets by any communication, including oral, documentary, electronic or magnetic information transmittal device or media.

4.2     Duration of Confidential Information and Trade Secrets. This obligation of non-disclosure and non-use shall last so long as the information remains confidential. However, Employee understands that if Employee primarily lives and works in any state requiring a temporal limit on non-disclosure clauses, Confidential Information that is not a Trade Secret shall be protected for no less than two (2) years following the Last Day. Employee also understands that Trade Secrets are protected by statute and are not subject to any time limits. Employee also agrees to contact the Company's Human Resources Director in writing before using, disclosing, or distributing any Confidential Information or Trade Secrets if Employee has any questions about whether such information is protected information.

4.3     Immunity under the Defend Trade Secrets Act of 2016. Employee shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a Trade Secret that: (a) is made (i) in confidence to a Federal, State, or local government official, either directly or Indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In certain circumstances, disclosures to attorneys made under seal or pursuant to court order are also protected under said Act.

4.4     Additional Legal Exceptions to Non-Disclosure Obligations. Nothing in this Agreement shall be construed to prevent Employee's disclosure of Confidential Information as may be required by applicable law or regulation, especially with respect to reporting a violation in good faith or cooperating with a Federal or State administrative agency (*e.g.*, Securities and Exchange Commission, Department of Labor, Equal Employment Opportunity Commission (or equivalent state employment agencies), etc.), or pursuant to the valid order of a court of competent jurisdiction; provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Only with respect to an order of a court of competent jurisdiction, Employee shall promptly provide the Company's Deputy General Counsel with written notice of any such order. If the Company chooses to seek a protective order or other remedy, Employee shall cooperate fully with the Company. If the Company does not obtain a protective order or other remedy or waives compliance with certain provisions of this Agreement, Employee shall furnish only that portion of the Confidential Information which, in the written opinion of counsel, is legally required to be disclosed and Employee shall use Employee's best efforts to obtain assurances that confidential treatment will be accorded to such disclosed Confidential Information. In addition, nothing in this Agreement in any way prohibits or is intended to restrict or impede, and shall not be interpreted or understood as restricting or impeding Employee from: (a) if Employee is in a non-supervisory or non-managerial role, exercising Employee's rights under Section 7 of the National Labor Relations Act (NLRA) (including with respect to engaging in concerted activities for the purpose of collective bargaining or other mutual aid or protection, discussing terms and conditions of employment, or otherwise engaging in protected conduct); or (b)

otherwise disclosing or discussing truthful information about unlawful employment practices (including unlawful discrimination, harassment, retaliation, or sexual assault).

5.    **Publicity, Return of Company Property and Information/Social Media**.

    5.1    Publicity Consent and Release. During employment and after the Last Day, Employee consents to the Company's use of Employee's image, likeness, voice, or other characteristics in the Company's products, services, or marketing or informational materials; and Employee hereby releases and discharges the Company from any and all claims regarding the same. If Employee decides to revoke this consent and release, Employee must notify the Company's Legal Department in writing. Such revocation will only apply prospectively. By agreeing to this consent release and until Employee revokes the consent and release, Employee agrees that the Company is relying on Employee's consent and release and that the Company will not be liable to Employee for the Company's use of Employee's image, likeness, voice, or other characteristics. Employee represents that Employee has obtained, for the benefit of the Company, the same consent release in writing from all third parties whose characteristics are included in the services, materials, computer programs, and other deliverables that Employee provides the Company.

    5.2    Return of Property. Employee agrees that upon the Last Day (or earlier if requested by the Company) Employee shall immediately return to the Company all property and information belonging to the Company (in electronic or hard-copy form). Employee shall also disclose to the Company any passwords for Employee's computer or other access codes for anything associated with Employee's employment with the Company, and shall not delete or modify any property (including by factory resetting or wiping devices) prior to its return to the Company. To the extent that any Company information (whether or not such information is designated as confidential or proprietary) resides on Employee's personal computer, tablet, external hard drives, flash drives, cloud-based storage platforms, or any other personal device or storage location ("**Employee Devices**"), Employee shall cooperate with the Company to remove or delete such information from the Employee Devices, including by providing access and passwords to the Employee Devices to the Company's third-party forensic provider. The third-party forensic provider shall hold Employee's personal information in confidence (and not disclose it to the Company) and shall limit its activity solely to removing and deleting Company information from the Employee Devices.

    5.3    Social Media. Unless otherwise agreed to in writing by the Company in advance, Employee further acknowledges and agrees that, beginning on the Last Day, (a) Employee shall remove any reference to the Company as Employee's current employer from any source Employee controls, either directly or Indirectly, including, but not limited to, any social media, including LinkedIn, Facebook, X (formerly known as Twitter), Instagram, Google+, and/or TikTok, etc. and (b) Employee is not permitted to represent Employee as currently being employed by the Company to any person or entity, including, but not limited to, on any social media.

6.    **Assignment of Inventions and Intellectual Property**.

    6.1    Assignment of Inventions. Employee hereby irrevocably assigns, and agrees to assign in the future, exclusively to the Company, all right, title, and interest in and to any and all Inventions that (a) relate to, result from, or are suggested by the Company's current or proposed business, or actual or demonstrably anticipated research or developments of the Company, and that are discovered, developed, created, conceived, reduced to practice, made, learned, or written by Employee, either alone or jointly with others, during Employee's employment; (ii) utilize, incorporate, or otherwise relate to Confidential Information; or (iii) are discovered, developed, created, conceived, reduced to practice, made, or written by Employee using Company time, property, equipment, confidential information or trade secrets. The Company hereby accepts such assignments. Employee

agrees such Inventions are the sole property of the Company, and the Company shall be the sole owner of all intellectual property rights associated with such Inventions. "**Inventions**" means any and all developments, discoveries, techniques, modifications, improvements, technology, trade secrets, computer programs, mask works, know-how, processes, concepts, methods, systems, specifications, algorithms, designs, formulas, original works of authorship, or any other intellectual property whatsoever, whether or not patentable or registrable under copyright, trademark, or similar laws or subject to analogous protection, as well as trade secrets.

6.2     Exceptions to Assignment of Inventions. This assignment does not apply to any Invention for which no equipment, supplies, facilities, intellectual property, confidential information, or trade secrets of the Company were used and which was developed entirely on Employee's own time, or the Invention is non-assignable under any applicable statutes. Employee agrees this constitutes any required notice of non-assignability, including under applicable state laws (*e.g.*, **California**, § 2870 of the California Labor Code; **Delaware**, Del. Code Ann. tit.19, § 805, of the Delaware Code; **Illinois**, 765 ILCS 1060/1; **Kansas**, Kansas Statutes Annotated, Stat. Ann. § 44-130; **Minnesota**, Minn. Stat. Ann. § 181.78; **Nevada**, Nev. Rev. Stat. Ann. § 600.500; **New Jersey**, N.J. Stat. § 34:1B-265; **New York**, New York Labor Law § 203-F; **North Carolina**, N.C. Gen Stat. § 66-57.1; **Utah**, Utah Code Ann. § 34-39-3(1)-(3); **Washington**, Wash. Rev. Code Ann. § 49.44.140-49.44.150). To the extent there are any differences between this section and any specific state law, the state law shall control.

6.3     Copyright and Works Made for Hire. Employee acknowledges that all copyrightable works that are made by Employee (solely or jointly with others) within the scope of employment or during the period of Employee's employment with the Company and which are protectable by copyright are "works made for hire" under the Copyright Act, and, if applicable, are deemed specially ordered by the Company under the U.S. Copyright law. The Company owns and will own all rights under copyright in and to such works, and the Company is and will be considered the author of such works. To the extent that any such work may not be deemed to be a work made for hire, Employee hereby irrevocably assigns and vests all right, title, and interest in and to such work to the Company. If any such work cannot be assigned, Employee hereby grants to the Company a license subject to the same terms as the license for Prior Inventions (below).

6.4     Employee Cooperation in Protection of Intellectual Property Rights. Employee agrees to cooperate with protecting and enforcing the Company's intellectual property rights and Inventions by doing requested acts. If the Company can obtain Employee's cooperation for any reason, then Employee irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney in fact, to act for and on Employee's behalf to carry out any acts deemed necessary by the Company. This appointment is coupled with an interest in and to Employee's rights, title, and interest, and it survives Employee's death or disability.

6.5     Prior Inventions and Obligations. Employee agrees to immediately disclose any Inventions employee believes are non-assignable and to disclose upon execution of this Agreement any Inventions Employee owns or created prior to employment with the Company ("Prior Inventions"). Such disclosure will be in writing and in sufficient detail for the Company to evaluate ownership. If no Prior Inventions are disclosed, Employee represents and warrants that there are no Prior Inventions, and Employee forever waives any claims against the Company or contrary to the Company's interests based on such undisclosed Prior Inventions. Employee agrees not to allow any Prior Invention to be incorporated into Invention, product, process, technology, service, or machine of the Company without express written permission and direction. If, in the course of Employee's employment, Employee nevertheless does so or allows such incorporation to occur, then the Company is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, transferable, perpetual, fully paid up, worldwide license (with the right to sublicense) to such Prior Invention, including but not limited to, rights to make, have made, copy, modify, make derivative works of, use, sell, offer to

sell, distribute and otherwise exploit, for example, as part of or in connection with such Company Invention or other product, process, service or machine. Employee represents and warrants that Employee has no continuing obligations with respect to the assignment of Inventions, ideas, discoveries, or creations to any previous employer or to any other person or entity; or, if there are such obligations, they are disclosed to the Company in writing in sufficient detail contemporaneously with executing this agreement.

6.6     Holdover Inventions. Except for employees primarily living or working in California, the following obligation applies: For a period of two (2) years after the end of Employee's employment, Employee will (a) disclose to the Company all Inventions that Employee makes, develops, invents, or reduces to practice (alone or jointly with others) and (b) provide the Company with a complete copy of each patent application and copyright registration application (including but not limited to any mask work registration application) filed by Employee or that names Employee as an inventor, co-inventor, author, co-author, creator, co-creator, developer, or co-developer. Employee will provide the Company with such information within ten (10) days from the filing date of such applications or when any other Invention is reduced to practice or used in commerce, whichever is sooner. If such Inventions or applications meet the criteria of the Company's Inventions set forth above Employee agrees they are subject to the assignment provisions of this Agreement and are owned by the Company.

6.7     Moral Rights. To the maximum extent allowed by law, the assignment of Inventions and rights in this Agreement includes all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral" or the like (collectively, "**Moral Rights**"). To the extent that Employee retains any such Moral Rights under applicable law, Employee hereby ratifies and consents to (and provides all necessary ratifications and consents to) any action that may be taken with respect to such Moral Rights by (or authorized by) the Company, and Employee waives any Moral Rights with respect thereto. Employee will confirm any such ratifications, consents and agreements from time to time as requested by the Company.

7.     **Employment Relationship, Notice and Potential Payment**. Employee's employment by the Company may be terminated for any reason at any time by either Employee or the Company. But, as additional consideration for Employee's obligations under this Agreement, if the Company (in its sole discretion) elects to terminate Employee's employment, the Company will provide Employee with two (2) weeks' written notice or the Company will pay Employee two (2) weeks of Employee's base salary instead of notice. The Company, however, may end the employment relationship without either notice or salary continuation instead of notice if the Company terminates Employee for Major Infractions as defined under Company policy. Examples of Major Infractions include, but are not limited to, gross misconduct, theft of or intentional damage to the Company's property, abuse of alcohol on working time on the Company's premises, use of illegal drugs, commission of a criminal act (other than a misdemeanor traffic offense), insubordination, dishonesty, or willful violation of the Company's policy prohibiting employees from disposing of shares of the Company's stock for personal gain based on knowledge of the Company's activities or results when such information is not available to the general public.

8.     **Severability and Reformation**. The covenants in each section of this Agreement are independent of any other provisions of this Agreement. Each term in this Agreement constitutes a separate covenant between the parties, and each term is fully severable from any other term. Employee and the Company agree if any particular paragraphs, subparagraphs, phrases, words, or other portions of this Agreement are determined by an appropriate court or arbitrator to be invalid or unenforceable as written, they shall be modified as necessary to comport with the reasonable intent and expectations of the parties and in favor of providing reasonable protection to all of the Company's legitimate business interests, and such modification shall not affect the remaining provisions of this Agreement, or if they cannot be modified to be

made valid or enforceable, then they shall be severed from this Agreement, and all remaining terms and provisions shall remain enforceable.

9. **Tolling**. As a form of equitable relief, unless prohibited by law, the Company reserves the right to request, and Employee will not object, that a court of competent jurisdiction or arbitrator extend the Restricted Period for any period of time that Employee is in breach of this Agreement so that the Company receives the full benefit of Employee's promises in the restrictive covenants.

10. **Relief, Remedies and Enforcement**. Employee acknowledges and agrees that a breach of any provision of this Agreement by Employee will cause serious and irreparable injury to the Company that will be difficult to quantify and that money damages alone will not adequately compensate the Company. In the event of a breach or threatened or intended breach of this Agreement by Employee, the Company shall be entitled to injunctive relief, both temporary and final, enjoining and restraining such breach or threatened or intended breach. Employee further agrees that should Employee breach this Agreement, the Company will be entitled to any and all other legal or equitable remedies available to it, including the recovery and return of any amount paid to Employee to enter into this Agreement, and/or the disgorgement of any profits, commissions, or fees realized by Employee, any subsequent employers, any business owned or operated by Employee, or any of Employee's agents, heirs, or assigns. Employee shall also pay the Company all reasonable costs and attorneys' fees the Company incurs because of Employee's breach of any provisions of this Agreement.

11. **Entire Agreement, Amendments**. Employee agrees that this Agreement constitutes the entire agreement and understanding between the parties and supersedes any prior agreements, either oral or in writing, between Employee and the Company with respect to all matters within the scope of this Agreement. No provision of this Agreement may be modified, waived, or discharged unless such waiver, modification, or discharge is agreed to in writing and signed by Employee and the Company's Deputy General Counsel. This Agreement shall be enforced in accordance with its terms and shall not be construed against either party. No waiver granted under this Agreement as to any provision in this Agreement shall constitute a subsequent waiver of such provision or of any other provision of this Agreement, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

12. **No Conflicts**. Employee represents and warrants that Employee's performance of all the terms of this Agreement, and the performance of Employee's duties as an employee of the Company or the fact of Employee's employment with the Company, do not and will not breach any agreement between Employee and any other person, including any prior employer. Employee further agrees not to use or bring on to the Company premises (in hard-copy or in electronic form) any property or information belonging to a prior employer.

13. **Survival**. The obligations Employee has undertaken in this Agreement shall survive the Last Day and no dispute regarding any other provisions of this Agreement or regarding Employee's employment or the termination of Employee's employment shall prevent the operation and enforcement of these obligations.

14. **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall constitute an original, and all of which shall constitute one instrument. A signature made on a PDF or facsimile copy of this Agreement or a signature to this Agreement transmitted by PDF or facsimile shall have the same effect as an original signature. No party to this Agreement will raise the use of a PDF file or other electronic transmission to deliver a signature as a defense to the formation of a contract and each party waives any such defense.

15. **Successors and Assigns**. This Agreement shall be binding upon, and inure to the benefit of, the parties and their respective successors and permitted assigns. Employee may not assign Employee's rights and obligations under this Agreement without prior written consent of the Company. The Company may assign

this Agreement and/or its rights or obligations under this Agreement. Any and all rights and remedies of the Company under this Agreement shall inure to the benefit of and be enforceable by any successor or assignee of the Company.

16.    **Arbitration, Governing Law, Venue and Waiver**. The parties incorporate by reference any separate employment arbitration agreement between them (the "Employment Arbitration Agreement"). The Employment Arbitration Agreement shall be governed by and interpreted pursuant to the Federal Arbitration Act; except that the parties hereby specifically agree that in connection with the arbitration of disputes under this Agreement, or if Employee did not sign the Employment Arbitration Agreement, the law of the State in which the Employee is domiciled at the time of Employee's signature of this Agreement shall be the substantive law that governs the interpretation, application, and enforcement of Sections 2, 3 and 4 of this Agreement, without regard to any choice of law rules of that or any other state. They further otherwise agree that in the absence of Employee's execution of the Employment Arbitration Agreement, that the exclusive venue for such injunctive relief shall be the state or federal courts sitting in or covering the county where Employee is domiciled. The parties waive any defense, whether asserted by motion or pleading, that the venue specified by this section is an improper or inconvenient venue; provided that the Company may commence a legal proceeding in any other relevant jurisdiction for the purpose of enforcing its rights under this Agreement.

17.    **Restrictive Covenant Addenda**. Employee acknowledges and agrees that different restrictive covenant obligations other than those set forth in Section 3 and other provisions in this Agreement may apply to Employee if Employee primarily resides or works in certain jurisdictions. While Employee primarily resides or works in such a jurisdiction, including on the Last Day, Employee agrees that the restricted activities set forth in Section 3, as well as any other applicable provisions set forth in this Agreement, shall be superseded only as set forth in the applicable Addendum attached hereto as **Appendix A**.

18.    **Electronic Signature**. Employee agrees that the Company may enforce this Agreement with a copy for which Employee has provided an electronic signature, and that such electronic signature may be satisfied by procedures that the Company or a third party designated by the Company has established or may establish for an electronic signature system, and Employee's electronic signature shall be the same as, and shall have the same force and effect as, Employee's written signature. By electronically accepting this Agreement, Employee agrees to the following: "This electronic contract contains Employee's electronic signature, which I have executed with the intent to sign this Agreement."

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement freely and voluntarily with the intention of being legally bound by it.

**EMPLOYEE**

Signature: _____

Printed Name:    Tatum Garrity_____

Title:    Uniform Sales Representative_____

Location:    0470 MINNEAPOLIS MN RNTL_____

Dated:    September 2, 2025_____

**CINTAS CORPORATION**

Signature: _____

Printed Name:    Tirey Burch_____

Title:    Director of Sales - Rental_____

Dated:    October 7, 2025_____

US EA 2 Rev. 7.30.2024

## APPENDIX A
## ADDENDA TO PROTECTIVE AGREEMENT

As set forth in **Section 17** of the above Employment Protective Agreement (the "Agreement"), Employee acknowledges and agrees that certain restricted activities set forth in Section 3, as well as other provisions set forth in the Agreement, are superseded or modified by an Addendum if Employee primarily resides or works in any of the following jurisdictions:

California
Colorado
District of Columbia
Georgia
Illinois
Louisiana
Massachusetts
Minnesota
Nebraska
North Dakota
Oklahoma
Oregon
Virginia
Washington
Wisconsin

To the extent that Employee primarily resides or works in such a jurisdiction, Employee agrees that the restricted activities and other provisions set forth in the Agreement shall be superseded only as set forth in the applicable Addendum below, to which Employee agrees simultaneously with the execution of the Agreement.

Capitalized terms used but not defined in the following Addenda shall have the respective meanings ascribed to such terms in the Agreement. This section is expressly incorporated into and made part of each Addendum below.

### MINNESOTA ADDENDUM

**Addendum No. 1**:

The language in Section 3.1 "**Non-Competition**" is stricken in its entirety and replaced with the following:

> During Employee's employment with the Company, through the end of the Last Day, Employee shall not be employed by, or otherwise provide services on behalf of, a Competitor, or perform the same or similar duties Employee performed for the Company in connection with a Competitive Product or Service.

**Addendum No. 2**:

The language in Section 3.2 "**Non-Solicitation and Non-Inducement of Customers**" is stricken in its entirety and replaced with the following:

> During the Restricted Period and in connection with a Competitive Product or Service, Employee shall not, directly or Indirectly: (a) solicit, refer, induce or encourage (or attempt to

A-1                                                                                    Rev. 7.30.2024

solicit, refer, induce or encourage) any Customer to do business with a Competitor; and/or (b) induce or encourage (or attempt to induce or encourage) any Customer to terminate a relationship with the Company or otherwise to cease accepting services or products from the Company.

**Addendum No. 3**:

The heading of Section 3.5 "**Covenants are Reasonable**" is changed to "**Covenants are Reasonable/Consideration**," and the language of said Section is modified by adding the following language at the end of said Section:

Employee further acknowledges and agrees that (a) the covenants in this Section are no broader than necessary to protect the Company's legitimate business interests (including but not limited to business interests in its Confidential Information, Trade Secrets, goodwill, customer relations, and employee relations), (b) those business interests cannot be adequately protected other than through these covenants, (c) Employee and the Company bargained for the terms of this Agreement, including the covenants in this Section and the consideration therefor, and (d) Employee either (i) was advised, prior to Employee's acceptance of the Company's offer of employment, of the terms of this Agreement, and that the Company's offer of employment was contingent on Employee's agreement to those terms, or (ii) received additional consideration in exchange for entering into this Agreement, to which Employee was not otherwise entitled, which additional consideration gave Employee real advantages.

**Addendum No. 4**:

The language in Section 16 "**Governing Law, Venue and Waiver**" is modified by adding the following language at the end of said Section:

Notwithstanding the foregoing, Employee understands that while Employee primarily resides and works in the State of Minnesota, the Agreement will be construed and enforced in accordance with the substantive laws of the State of Minnesota without reference to principles of conflicts of laws.

| EMPLOYEE | | CINTAS CORPORATION | |
|---|---|---|---|
| Signature: | *Tatum Garrity* | Signature: | *Tirey Burch* |
| Printed Name: | Tatum Garrity | Printed Name: | Tirey Burch |
| Title: | Uniform Sales Representative | Title: | Director of Sales - Rental |
| Location: | 0470 MINNEAPOLIS MN RNTL | Dated: | October 7, 2025 |
| Dated: | September 2, 2025 | | |

A-2                                                                                    Rev. 7.30.2024