**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Cintas Corporation | Civil Action No.  2:26-cv-00302-JFM |
| Plaintiff, | |
| -against- | |
| ImageFIRST Healthcare Laundry Specialists, | |
| Defendant. | |

**DEFENDANT IMAGEFIRST'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW IN OPPOSITION TO PLAINTIFF CINTAS' MOTION FOR
<u>PRELIMINARY INJUNCTION AND OTHER RELIEF</u>**

**TABLE OF CONTENTS**

I.     PROCEDURAL BACKGROUND................................................................................ 1

II.    FINDINGS OF FACT............................................................................................... 2

       A.    ImageFIRST's and Cintas' Businesses Have Minimal Competitive
             Overlap................................................................................................................ 2

       B.    ImageFIRST's Hiring of Former Cintas Employees. ........................................... 3

       C.    There is No Evidence That ImageFIRST Received, Used, or Disclosed
             Cintas' Trade Secrets. ........................................................................................ 4

       D.    Cintas' Arbitration Proceedings Against Former Cintas Employees. .................... 7

III.   CONCLUSIONS OF LAW ........................................................................................ 9

       A.    Standard of Review............................................................................................... 9

       B.    An Evidentiary Hearing on Cintas' Motion Is Not Needed................................. 10

       C.    Cintas Fails to Show the Risk of Immediate and Irreparable Harm. .................... 11

       D.    Cintas Fails to Show a Likelihood of Success on the Merits................................ 16

             1.    Cintas Fails to Demonstrate a Likelihood of Success on the Merits
                   of its Trade Secret Misappropriation Claims Under Federal and
                   Pennsylvania Law. ..................................................................................... 16

             2.    Cintas Fails to Demonstrate a Likelihood of Success on the Merits
                   of its Claim for Tortious Interference with Contracts................................ 32

             3.    Cintas Fails to Demonstrate a Likelihood of Success on the Merits
                   for the Rest of its Claims. .......................................................................... 36

       E.    Cintas Fails to Establish the Other Factors Needed for Injunctive Relief. ........... 40

IV.    CONCLUSION...................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acclaim Systems v. Infosys,*
  2015 U.S. Dist. LEXIS 90937 (E.D. Pa. July 14, 2015)............................................................33

*Acumed LLC v. Advanced Surgical Servs., Inc.,*
  561 F.3d 199 (3d Cir. 2009).................................................................................32, 33, 34

*Adams v. Freedom Forge Corp.,*
  204 F.3d 475 (3d Cir. 2000)...............................................................................................14

*Am. Bev. Corp. v. Diageo N. Am., Inc.,*
  936 F. Supp. 2d 555 (W.D. Pa. 2013)................................................................................13

*Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff,*
  669 F.3d 359 (3d Cir. 2012)...............................................................................................10

*Am. Freedom Def. Initiative v. SEPTA,*
  92 F. Supp. 3d 314 (E.D. Pa. 2015) ..................................................................................16

*Am. Osteopathic Ass'n* v. *Am. Bd. of Internal Med.,*
  555 F. Supp. 3d 142 (E.D. Pa. 2021) ................................................................................34

*B.P. Chems. Ltd. v. Formosa Chem. & Fibre Corp.,*
  229 F.3d 254 (3d Cir. 2000)...............................................................................................41

*Bimbo Bakeries USA, Inc. v. Botticella,*
  613 F.3d 102 (3d Cir. 2010)........................................................................................ *passim*

*Bradley v. Pittsburgh Bd. of Educ.,*
  910 F.2d 1172 (3d Cir. 1990).............................................................................................10

*Bro-tech Corp. v. Thermax, Inc.,*
  651 F. Supp. 2d 378 (E.D. Pa. 2009) ................................................................................39

*CentiMark Corp. v. Jacobsen,*
  2011 U.S. Dist. LEXIS 136996 (W.D. Pa. Nov. 29, 2011) ..........................................27, 28

*Checker Cab of Phila., Inc. v. Uber Techs., Inc.,*
  643 F. App'x 229 (3d Cir. 2016) ........................................................................................15

*Citibank, N.A. v. Citytrust,*
  756 F.2d 273 (2d Cir. 1985)...............................................................................................12

*Colorcon v. Lewis*,
792 F. Supp. 2d 786 (E.D. Pa. 2011) ..........................................................27, 28, 32

*Cont'l Grp., Inc. v. Amoco Chems. Corp.*,
614 F.2d 351 (3d Cir. 1980)........................................................................11, 41

*Contour Data Sols. LLC v. Gridforce Energy Mgmt. LLC*,
2021 U.S. Dist. LEXIS 166950 (E.D. Pa. Sept. 2, 2021) ........................................13

*DePuy Synthes Sales, Inc. v. Globus Med., Inc.*,
259 F. Supp. 3d 225 (E.D. Pa. 2017) ..........................................................36, 39, 40

*Doltz v. Harris & Assocs.*,
280 F. Supp. 2d 377 (E.D. Pa. 2003) ..........................................................39

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*,
765 F.3d 205 (3d Cir. 2014)........................................................................11

*First Health Group Corp. v. Nat'l Prescription Adm'rs, Inc.*,
155 F. Supp. 2d 194 (M.D. Pa. 2001) ..........................................................15, 28

*Freedom Med. Inc. v. Whitman*,
343 F. Supp. 3d 509 (E.D. Pa. 2018) ..........................................................11, 23, 29

*Gen. Refractories Co. v. Fireman's Fund Ins. Co.*,
337 F.3d 297 (3d Cir. 2003)........................................................................38

*Giordano v. Claudio*,
714 F. Supp. 2d 508 (E.D. Pa. 2010) ..........................................................37, 38

*Greater Phila. Chamber of Commerce v. City of Phila.*,
949 F.3d 116 (3d Cir. 2020)........................................................................9, 41, 42

*Gridkor, LLC v. Collins*,
2025 U.S. Dist. LEXIS 152818 (E.D. Pa. Aug. 8, 2025)........................................40

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
774 F.3d 192 (3d Cir. 2014)........................................................................9

*Heritage Fence Co. v. Malin*,
2024 U.S. Dist. LEXIS 221920 (E.D. Pa. Dec. 9, 2024)........................................20, 26

*Herley Indus. v. R Cubed Eng'g. LLC*,
2021 U.S. Dist. LEXIS 11949 (E.D. Pa. Jan. 22, 2021) ........................................22

*Imagine Grp. v. Biscanti*,
2025 U.S. Dist. LEXIS 231166 (D. Del. Nov. 24, 2025) ........................................26

*IQVIA, Inc. v. Breskin*,
    2023 U.S. Dist. LEXIS 47174 (E.D. Pa. Mar. 20, 2023).................................................. *passim*

*Lanin v. Borough of Tenafly*,
    515 F. App'x 114 (3d Cir. 2013) .......................................................................................12

*Larry Pitt & Associates v. Lundy Law, LLP*,
    57 F. Supp. 3d 445 (E.D. Pa. 2014).................................................................................38

*Latuszewski v. VALIC Fin. Advisors, Inc.*,
    393 F. App'x. 962 (3d Cir. 2010) .....................................................................................17

*Leedsworld, Inc. v. Hare*,
    2025 U.S. Dist. LEXIS 52198 (W.D. Pa. Mar. 21, 2025) .......................................................23

*Madison Square Garden Corp. v. Braddock*,
    90 F.2d 924 (3d Cir. 1937)................................................................................................10

*Mallet & Co., Inc. v. Lacayo*,
    16 F.4th 364 (3d Cir. 2021) ................................................................................. *passim*

*Mitchell Partners, L.P. v. Irex Corp.*,
    2010 U.S. Dist. LEXIS 103248 (E.D. Pa. Sept. 29, 2010), *Rev'd on other grounds*,
    656 F.3d 201 (3d Cir. 2011)..............................................................................................37

*Moore v. Kulicke & Soffa Indus.*,
    318 F.3d 561 (3d Cir. 2003)..............................................................................................17

*New Dana Perfumes Corp. v. The Disney Store, Inc.*,
    131 F. Supp. 2d 616 (M.D. Pa. 2001).................................................................................13

*NRA Grp., LLC v. Durenleau*,
    154 F.4th 153 (3rd Cir. 2025) ..........................................................................................40

*Oakwood Labs. LLC v. Thanoo*,
    999 F.3d 892 (3d Cir. 2021).................................................................................. *passim*

*Orson, Inc. v. Miramax Film Corp.*,
    836 F. Supp. 309 (E.D. Pa. 1993).................................................................................12, 13

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*,
    428 F.3d 504 (3d Cir. 2005)..............................................................................................10

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017)................................................................................. *passim*

*Sarpolis v. Tereshko*,
    26 F. Supp. 3d 407 (E.D. Pa. 2014), *aff'd*, 625 F. App'x 594 (3d Cir. 2016) ........................40

*SI Handling Systems, Inc. v. Heisley*,
753 F.2d 1244 (3d Cir. 1985)........................................................................................13

*Signant Health Holding Corp. v. Debonis*,
2024 U.S. Dist. LEXIS 107699 (E.D. Pa. June 18, 2024) ..................................11, 23

*Simon v. Unumprovident Corp.*,
2002 U.S. Dist. LEXIS 9331 (E.D. Pa. May 23, 2002) ................................................39

*Stantec Consulting Servs. v. Arslan*,
2021 U.S. Dist. LEXIS 189495 (E.D. Pa. Sept. 30, 2021) ............................... *passim*

*Synthes (USA) v. Globus Med., Inc.*,
2005 U.S. Dist. LEXIS 19962 (E.D. Pa. Sept. 14, 2005) ..........................................40

*Synthes, Inc. v. Emerge Med., Inc.*,
25 F. Supp. 3d 617 (E.D. Pa. 2014) ...........................................................................36

*Synthes, Inc. v. Emerge Med., Inc.*,
2012 U.S. Dist. LEXIS 134886 (E.D. Pa. Sept. 19, 2012) .........................................39

*TGaS Advisors, LLC v. Zensights, LLC*,
2016 U.S. Dist. LEXIS 100768 (E.D. Pa. Aug. 1, 2016)...........................................41

*USX Corp. v. Adriatic Ins. Co.*,
99 F. Supp. 2d 593 (W.D. Pa. 2000)...........................................................................38

*Vertex v. Avalara*,
2024 U.S. Dist. LEXIS 62777 (E.D. Pa. Apr. 5, 2024) .............................................33

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008)........................................................................................................11

**State Cases**

*Albee Homes, Inc. v. Caddie Homes, Inc.*,
417 Pa. 177 (1965)................................................................................................34, 38

*AMN Healthcare v. Aya Healthcare Servs.*,
28 Cal. App. 5th 923 (2018) .....................................................................................8, 15

*Deveaux v. Palmer*,
558 A.2d 166 (Pa. Commw. Ct. 1989) ........................................................................33

*Jones v. City of Philadelphia*,
73 Pa. D. & C. 4th 246, 2005 Phila. Ct. Com. Pl. LEXIS 239 (2005)....................................33

*Liberty Mut. Grp., Inc. v. 700 Pharm., LLC*,
270 A.3d 537 (Pa. Super. Ct. 2022)............................................................................36

*Morgan's Home Equip. Corp. v. Martucci*,
    390 Pa. 618 (1957)................................................................................................34

*Oberg Industries v. Finney*,
    382 Pa. Super. 525 (1989)....................................................................................27

*Whyte v. Schlage Lock Co.*,
    101 Cal. App. 4th 1443 (2002) ............................................................................29

**Federal Statutes**

18 U.S.C. § 1836(b)(1) ............................................................................................17

18 U.S.C. § 1839....................................................................................17, 20, 23

**State Statutes**

12 Pa. Cons. Stat. § 5302 ..................................................................................20, 23

Cal. Bus. & Prof. Code § 16600 *et seq.* ....................................................................15

Pennsylvania Uniform Trade Secrets Act.................................................... *passim*

**Rules**

Fed. R. Civ. P.12(b)(6).............................................................................................22

Fed. R. Civ. P. 65 ...........................................................................................10, 19, 20

**Other Authorities**

Restatement (Second) of Torts § 768.......................................................................34

## I.     PROCEDURAL BACKGROUND

1.     On January 16, 2026, Cintas filed its Complaint asserting eight counts against ImageFIRST for (1) misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act (the "DTSA") and (2) the Pennsylvania Uniform Trade Secrets Act (the "PUTSA"); (3) tortious interference with Cintas' employment agreements with former employees; (4) aiding and abetting breach of duty of loyalty; (5) tort of another; (6) unjust enrichment; (7) unfair competition; and (8) civil conspiracy. *See generally* DI 1.

2.     While Cintas noted in its Complaint that it sought preliminary and permanent injunctive relief (*see id.*, Prayer for Relief § B), it did not file its Motion for Preliminary Injunction and Other Relief (the "Motion") until March 30, 2026, seventy-three days after filing its Complaint, and shortly after ImageFIRST filed its Motion to Dismiss that same day. *See* DI 25 (Motion to Dismiss); *see also* DI 27 (Motion for Preliminary Injunction). Cintas bases its Motion on its DTSA, PUTSA, tortious interference, aiding and abetting breach of duty of loyalty, unfair competition, and civil conspiracy claims and seeks an injunction enjoining ImageFIRST from using, disclosing, or relying upon Cintas' trade secrets or confidential information; soliciting Cintas' customers using Cintas' confidential information; soliciting Cintas' employees through use of Cintas' confidential information and through inducement of contractual breaches. *See* DI 27-17.

3.     ImageFIRST filed an Opposition to Cintas' Motion on April 27, 2026 (DI 35), and on May 11, 2026, Cintas filed its Reply in Support of its Motion (DI 38). Attached to Cintas' Reply were three supplemental declarations and twenty exhibits raising new factual assertions and issues

1

that were not present in Cintas' Motion.[1] The Court has scheduled an oral argument hearing on ImageFIRST's Motion to Dismiss (DI 25) and Cintas' Motion (DI 27) for May 19, 2026.

## II.    FINDINGS OF FACT

### A.    ImageFIRST's and Cintas' Businesses Have Minimal Competitive Overlap.

4.      Based in Pennsylvania, ImageFIRST is a nationwide leader in healthcare laundry rental services with less than 4,000 employees and approximately $700 million in yearly sales. DI 35-3, Declaration of David Hilderbrand ("Hilderbrand Decl."), ¶¶ 28-30.

5.      ImageFIRST primarily serves acute (*i.e.*, hospitals) or non-acute (*i.e.*, doctor's offices, senior living facilities, etc.) healthcare customers. *Id.* Between 80 to 90 percent of ImageFIRST's business consists of providing flat linen products, such as blankets, towels, sheets, and pillowcases, and services to healthcare facilities. *Id.*

6.      ImageFIRST utilizes specialized processes and machinery to hygienically clean healthcare linens according to regulatory requirements, an essential part of the business. *Id.* ¶ 31. ImageFIRST has the most U.S. laundry plants credentialed by the Healthcare Laundry Accreditation Council. *Id.*

7.      Cintas, by contrast, in 2025 had over 45,000 employees, sales of more than $10 billion, over one million customers in practically all industries across the United States, and product offerings across most business segments, including Uniform Rental and Facility Services, First Aid and Safety, Fire Protection Services, Direct Sales, and Strategic Markets. *Id.* ¶ 10; *see also* DI 35-10, Cintas 2025 10-K. The Strategic Markets segment includes Cintas' healthcare

---

[1] ImageFIRST reserves all rights regarding Cintas' belated submissions of additional declarations and exhibits, including objecting to the Court's consideration of the same and requesting leave to respond to these additional declarations and exhibits and to supplement the record based on the parties' submissions and at oral argument should the Court consider the belated factual assertions submitted with Cintas' Reply.

division. DI 35-3, Hilderbrand Decl., ¶ 10. Unlike ImageFIRST, Cintas does not have any laundry plants credentialed by the Healthcare Laundry Accreditation Council and cannot earn the credential because its plants are not set up for healthcare laundry. DI 35-3, Hilderbrand Decl., ¶ 31.

8.      Cintas only rents flat linen products in three states—Washington, Minnesota, and Louisiana—and it has conceded that its hospital linen business represents "a *de minimis* percentage of [Cintas'] company-wide annual revenue." *See* DI 35-8, Brosnan Discovery Responses, RFP No. 15 (emphasis in original); DI 35-3, Hilderbrand Decl., ¶ 29; DI 35-5, Hilderbrand Arbitration Award ("Award"), p. 3.

9.      Cintas does not advertise flat linen products on its healthcare-related webpages, demonstrating the insignificance of these products to Cintas' healthcare division. *See* DI 35-11–35-20, Cintas Healthcare Webpages.

10.      In a prior arbitration proceeding that Cintas brought against David Hilderbrand, a former Cintas employee who later joined ImageFIRST, the Arbitrator found that the competitive overlap between Cintas and ImageFIRST was "scant" and that the companies were not close competitors in the healthcare linen business. DI 35-3, Hilderbrand Decl., ¶ 32; DI 35-5, Award, p. 3.

**B.      ImageFIRST's Hiring of Former Cintas Employees.**

11.      ImageFIRST has hired a handful of former Cintas employees over the years into various positions nationwide. While Cintas suggests that these hirings were intended and timed to disrupt Cintas' operations, its own allegations belie its theory, as ImageFIRST only hired thirteen former Cintas employees (*out of Cintas' over 45,000 employees*) over a two-year period in different roles and locations across the country. DI 1, ¶¶ 22-48; DI 27-1, p. 5; *see also* DI 35-10, Cintas 2025 10-K; DI 27-3 – 27-12 (LinkedIn Profiles)

3

12.     Cintas also alleges "ImageFIRST poached at least thirteen Cintas employees in rapid succession—not coincidence," including Mikael Zuidema and Steve Browne. *See* DI 38, p. 2. Cintas fails to address that Mr. Zuidema quit Cintas approximately six months before he sought a position with ImageFIRST, during which time he was employed by a different company, JPR Medical, that has nothing to do with ImageFIRST. *See* DI 35-9, Zuidema Declaration Submitted in Arbitration ("Following my separation from Cintas [on March 1, 2024], I began working for JPR Medical. I started working for ImageFIRST in September 2024."). Similarly, Mr. Browne quit Cintas seven months before he sought a position with ImageFIRST, during which seven months he was employed by a different company, Interstate Waste Services, that also has nothing to do with ImageFIRST. *See* DI 27-6, S. Browne LinkedIn Profile (Director of Sales at Interstate Waste Services for 7 months before joining ImageFIRST).

13.     With only one exception – Tatum Garrity – none of the 13 employees who Cintas accuses of stealing its trade secrets even worked in the three states (Washington, Minnesota, and Louisiana) where Cintas sells healthcare linens. *See* DI 27-3 – 27-12 (LinkedIn Profiles). And Ms. Garrity focused on uniform sales programs – not healthcare linens or services – in the last year and a half of her employment with Cintas. *See* DI 27-10, T. Garrity LinkedIn Profile (Uniform Sales Professional a Cintas from June 2024 to December 2025).

C.     **There is No Evidence That ImageFIRST Received, Used, or Disclosed Cintas' Trade Secrets.**

14.     Other than declarations pled on "information and belief" or "with reason to believe" (*which fail to provide any facts substantiating such belief*), Cintas provides no evidence showing that ImageFIRST encouraged or instructed departing employees to: conceal their future employment; transfer, retain, or use Cintas' trade secret or confidential information; or minimize

4

Cintas' ability to protect its trade secret or confidential information. *See* DI 27-16, Roettgers Decl., ¶¶ 21, 23.

15.     To the contrary, the evidence shows that ImageFIRST required new hires, including the former Cintas employees, to sign an offer letter confirming they would fully comply with lawful restrictive covenants of, and not bring or use any confidential information belonging to, their former employers, and would comply with any obligations to provide advanced notice of their intent to join ImageFIRST:

> As excited as you and we are to have you join ImageFIRST, it is also still important that you ***comply fully with obligations you owe to third parties***, including obligations you may owe to your current employer or any former employer and the terms of any confidentiality, nondisparagement, non-competition, non-solicitation, or other form of restrictive covenant as well as obligations to provide advanced notice of your resignation and intent to join us, if any. ***It is also important that you not retain copies of any property, including any company work product or confidential information, belonging to any third party, including your current employer or any prior employer***, and that you take appropriate steps prior to joining us to return and not retain such materials in any form, including on any personal device or account maintained by you. ***It should go without saying that you will not be permitted to access, use, or disclose any such information or materials in connection with your employment with us***.

DI 35-4, Declaration of Natasha Romulus ("Romulus Decl."), ¶¶ 4-18 (citing DI 35-33 – 35-43, Offer Letters) (emphasis added).

16.     Cintas provides the Court with no evidence showing: (1) ImageFIRST instructed departing employees to steal Cintas' trade secrets; (2) ImageFIRST actually received or utilized any such information; or (3) even that the information was "trade secret" to begin with.

17.     Cintas has only described its alleged trade secrets as broad categories of business information, including pricing methodologies, sales processes, customer information, operational practices, and training materials. *See* DI 1, 27. Despite being central to the issues before the Court,

5

Cintas did not provide the Court with copies of its alleged trade secrets under seal when it filed its May 11, 2026 Reply, so that the parties (and the Court) can determine whether this information qualifies as trade secret. *See* DI 38, n.1 ("Documents containing Cintas's trade secrets are attached to the Poeppelmeier Supplemental Declaration in redacted form.").[2]

18.     Not only has Cintas generally failed to identify any specific document, file, dataset, or discrete item of information that it contends constitutes a trade secret, Cintas' forensic reviews of certain former employees' email accounts and devices beginning in or around October 2025, also did not identify specific trade secret information that ImageFIRST received, accessed, or reviewed any materials obtained from Cintas. *See* DI 27-15, Zucker Decl., ¶¶ 6-7, 15-16, 20-21; *see also* DI 27-14, Neal Decl., ¶¶ 7-8.

19.     Indeed, except for scheduling emails related to interviews and sharing a Teams link, Cintas identifies no communications between these employees and ImageFIRST transmitting documents or information, let alone a "trade secret." *See* DI 27-15, Zucker Decl., ¶¶ 10, 23.

---

[2] Since receiving Cintas' Reply on May 11, 2026, that included for the first time heavily redacted versions of documents Cintas claims to be trade secrets, ImageFIRST has sought to obtain access to unredacted versions of such documents so that it could effectively respond to these belatedly raised arguments and documents and prepare for the briefing and hearing deadlines in this matter. *See* DI 40, ImageFIRST Letter Motion; DI 41, Cintas' Response; DI 43, Court Order; DI 44, Joint Motion to Seal. ImageFIRST only received unredacted versions of these documents from Cintas on May 15, 2026, at 2:54 p.m. EST. ImageFIRST is in the process of reviewing these belatedly raised arguments and documents and reserves its right to seek relief from the Court to cure the prejudice caused by these tactics, including requesting denial of Cintas' Motion, requesting the Court not consider these documents, and requesting leave to respond to these documents and to supplement the record based on the parties' submissions and at oral argument should the Court consider the documents submitted with Cintas' Reply. *See* DI 43, Court Order ("We might observe that this is more of a concern for plaintiff than defendant. Obviously, if plaintiff, which carries the burden here, has not put defendant in a position to participate fairly in the preliminary injunction hearing, injunctive relief will simply be denied on that basis. And if plaintiff does not provide such a joined and fair record in a timely fashion, that also tends to work against the need for a preliminary injunction.").

20.    Cintas has not identified any specific lost customers, lost contracts, lost bids, or damaged customer relationships resulting from ImageFIRST's alleged conduct. *See* DI 1, 27, 38.

**D.    Cintas' Arbitration Proceedings Against Former Cintas Employees.**

21.    Cintas initiated four arbitration proceedings against several former employees who later joined ImageFIRST, including David Hilderbrand, Shelby Ray, Mikael Zuidema, and Brian Brosnan—none of which have revealed any disclosure or misuse of Cintas confidential or trade secret information by these former employees or ImageFIRST. *See* DI 35-5, Award, pp. 2-4; DI 35-7, Shelby Ray Settlement Agreement; DI 35-8, Brosnan Discovery Responses, RFP Nos. 4, 18; DI 35-9, Zuidema Declaration Submitted in Arbitration.[3]

22.    For example, Cintas' arbitration claims against Ms. Ray for alleged violation of her employment agreement and misappropriation of trade secrets ended in a "walk away" settlement whereby all claims were fully released and dismissed. DI 35-7, Shelby Ray Settlement Agreement, pp. 1-2. Similarly, Cintas dismissed its arbitration claims against Mr. Zuidema for alleged violation of his employment agreement and misappropriation of trade secrets after he confirmed that he had not used Cintas' confidential and trade secret information. DI 35-9, Zuidema Declaration Submitted in Arbitration.

23.    Even in the arbitration proceeding against Mr. Hilderbrand—in which the Arbitrator issued an Award dismissing all of Cintas' claims against Mr. Hilderbrand for alleged breach of the confidentiality obligations in his Cintas employment agreement, breach of fiduciary duties owed to Cintas, and misappropriation of Cintas' purported trade secrets in violation of Illinois and federal trade secret law—Cintas could not produce any evidence supporting any

---

[3] None of these awards, stipulations, discovery responses, declarations, or settlement agreement from these four arbitration proceedings were designated by Cintas as confidential.

improper access, use, disclosure, or exploitation of Cintas' confidential information by Mr. Hilderbrand. DI 35-5, Award, pp. 2-4; *see also* DI 35-3, Hilderbrand Decl., ¶¶ 3-8, 13, 16.

24.    More than that, as shown in the chart below, the allegations Cintas asserts in this case regarding Mr. Hilderbrand hiring at ImageFIRST, which Cintas relies on as the key evidence of the beginning of ImageFIRST's alleged scheme to misappropriate Cintas' trade secrets (*see* DI 1, ¶¶ 3-4, 22-28, 29), are contradicted by the evidence and findings in the *Hilderbrand* Arbitration, including by stipulations of undisputed facts signed by Cintas:

| Cintas' Allegations Regarding Mr. Hilderbrand Before the Court | Evidence in the *Hilderbrand* Arbitration |
|---|---|
| In this case, Cintas alleges that "[Mr.] Hilderbrand . . . possess[es] ***deep*** knowledge of Cintas's ***healthcare*** business, pricing methodologies, customer relationships, operational practices, sales playbooks, and strategic models." DI 27-13, Poeppelmeier Decl., ¶ 8 (emphasis added). | In the *Hilderbrand* Arbitration, ***Cintas stipulated that it was undisputed***, and the Arbitrator found that, during Mr. Hilderbrand's employment with Cintas, he ***did not***: (a) "work in Cintas' healthcare division," (b) "have healthcare customers assigned to him," (c) "sell flat linens to any of the customers that were assigned to him," or (d) "have access to confidential information regarding the healthcare business." DI 35-5, Award, p. 3 (citing DI 35-6, May 12, 2025 Joint Stipulation); *see also* DI 35-3, Hilderbrand Decl., ¶¶ 14-15. |
| In this case, Cintas alleges that "[i]n August 2024, Dave Hilderbrand, a long-***tenured Cintas Vice President of Sales*** and 20-year employee, resigned from Cintas and ***immediately joined ImageFIRST as its Chief Commercial Officer***. I believe this role sits at the top of ImageFIRST's sales organization and oversees nationwide strategy." DI 27-13, Poeppelmeier Decl., ¶ 9 (emphasis added).[4] | Mr. Hilderbrand had not been a Vice President Sales for more than two years before he quit his employment with Cintas. In June 2022, Cintas demoted Mr. Hilderbrand from Vice President of Sales to Enterprise National Account Manager ("ENAM"), a non-officer role in Cintas' National Accounts division. DI 35-3, Hilderbrand Decl., ¶ 12; DI 35-5, Award, pp. 1-2.<br><br>Mr. Hilderbrand's first position with ImageFIRST was Senior Vice President of Sales Operations, responsible for refining ImageFIRST's internal |

---

[4] After ImageFIRST highlighted Cintas' misrepresentation of Mr. Hilderbrand's role at Cintas in his final two years at Cintas in its Opposition, Cintas submitted a Supplemental Declaration from Chad Poeppelmeier where he confirms that Mr. Hilderbrand was not a Vice President of Sales but was instead employed as an "Enterprise National Account Manager at Cintas prior to his departure." *Compare* DI 38-2, Poeppelmeier Supp. Decl., ¶ 27 *with* DI 27-13, Poeppelmeier Decl., ¶ 9.

| | |
|---|---|
| | sales programs. DI 35-3, Hilderbrand Decl., ¶ 25; DI 35-5, Award, p. 2. Mr. Hilderbrand was promoted to Chief Commercial Officer in October 2025 (more than a year after joining ImageFIRST), a fact shown on Mr. Hilderbrand's LinkedIn profile attached as Exhibit A to Cintas' counsel's declaration. *See* DI 27-2, ¶ 4 (citing DI 27-3); *see also* DI 35-3, Hilderbrand Decl., ¶ 27. |
| In this case, Cintas alleges that "[Mr.] Hilderbrand . . . sent customer presentations, product offerings, and other confidential files to his personal email before resigning." DI 27-1, p. 6 (citing DI 1, ¶ 25); *see also* DI 27-1, p. 10 (citing pages 5-6 of Cintas' Motion and alleging that "ImageFIRST has misappropriated Cintas's trade secrets through a coordinated scheme to recruit and hire Cintas employees . . . ."). | In the *Hilderbrand* Arbitration, the Arbitrator found that "[Mr. Hilderbrand] provided a reasonable and legitimate explanation for emailing documents to his home address and believably testified he had not used or even opened the files." DI 35-5, Award, p. 4; *see also* DI 35-3, Hilderbrand Decl., ¶ 16 ("I did not forward these documents to my personal email for the purpose of stealing Cintas' information or property or to provide any information or documents to ImageFIRST."). |

## III.   CONCLUSIONS OF LAW

### A.   Standard of Review.

25.   A preliminary injunction is "an extraordinary remedy never awarded as of right." *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (internal quotation omitted).

26.   Cintas has the burden of showing "(1) a reasonable probability of success [on the merits of] the litigation, and (2) that it will be irreparably injured . . . if relief is not granted." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). The Third Circuit classifies these first two factors as "gateway" or "threshold" factors. *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020).

27.   Only if Cintas establishes a likelihood of prevailing on the merits and irreparable harm must the Court assess the final two factors, which are "(3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued [(i.e., the balance of equities)]; and (4) that the public interest weighs in favor of granting the injunction." *Id.* (citations and internal

brackets omitted); *see also Reilly*, 858 F.3d at 176 ("we have repeated that a district court—in its sound discretion—should balance those four factors so long as the party seeking the injunction meets the threshold on the first two."); *Mallet & Co., Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (determining that the court only considers the two remaining factors if the first two are established).

28.    The failure to present evidence to convince a court that each of the four factors favor preliminary injunctive relief "must necessarily result in the denial of a preliminary injunction." *Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) (citation omitted); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate.").

29.    Accordingly, the Third Circuit's longstanding legal maxim is: "upon an application for a preliminary injunction to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937).

### B.    An Evidentiary Hearing on Cintas' Motion Is Not Needed.

30.    Rule 65(a) "does not always require a live hearing, and courts sometimes rule based on the parties' paper submissions, such as when the issues are strictly legal or the facts are not in dispute." Fed. R. Civ. P. 65, practice commentary; *see also Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990) ("The applicable Federal Rule does not make a hearing a prerequisite for ruling on a preliminary injunction."). An evidentiary hearing is not required in several scenarios, including when "the movant is proceeding on a legal theory which cannot be sustained, because then there could be no showing of a likelihood of success on the merits," or "the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm." *Id.* at 1176.

10

31.     Here, there is no need for an evidentiary hearing because, as explained below, Cintas has failed to establish the "gateway factors" of irreparable harm or a likelihood of success on the merits. *See Stantec Consulting Servs. v. Arslan*, No. 20-cv-06121, 2021 U.S. Dist. LEXIS 189495, at *22 (E.D. Pa. Sept. 30, 2021) (finding that an "evidentiary hearing is not required in this case because Stantec has not shown a likelihood of success on the merits" and "the Court need not make any credibility determinations to rule on the request for injunctive relief"); *see also Signant Health Holding Corp. v. Debonis*, No. 24-cv-709, 2024 U.S. Dist. LEXIS 107699, at *22 (E.D. Pa. June 18, 2024) (denying motion for preliminary injunction following an oral argument hearing because the movant did not show likelihood of success on the merits and irreparable harm on its trade secret, breach of contract, or tortious interference claims).

### C.     Cintas Fails to Show the Risk of Immediate and Irreparable Harm.

32.     "Absent a showing of irreparable harm, a plaintiff is not entitled to injunctive relief, even if the other three elements are found." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 219 (3d Cir. 2014).

33.     To establish irreparable harm, Cintas must show more than a mere "possibility" of irreparable harm; it must "demonstrate that irreparable injury is *likely* in the absence of an injunction" and that there is no other adequate remedy. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 523 (E.D. Pa. 2018) (irreparable harm not presumed merely because elements of trade secret claim have been satisfied; movant also must make clear showing of immediate irreparable injury (citations omitted)). Accordingly, "(an injunction) may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (citations omitted).

11

34.     Cintas fails to make this showing.

35.     As a preliminary point, "the absence of irreparable harm is . . . evidenced by [Cintas'] delay in bringing this motion." *Orson, Inc. v. Miramax Film Corp.*, 836 F. Supp. 309, 312 (E.D. Pa. 1993); *see also Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117-18 (3d Cir. 2013) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985) ("[P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action.") (citation modified)).

36.     The bulk of employee departures underlying Cintas' claims of trade secret misappropriation occurred more than a year ago, beginning in 2024 and early 2025. *See* DI 1, ¶¶ 22, 30, 35, 40-44, 46-47. Cintas waited until January 16, 2026, well over a year after most of the departures, to sue ImageFIRST. *See* DI 1. Cintas has not sought injunctive relief against any of the former employees whose conduct forms the basis of its allegations, even though it sued four of them in arbitration. DI 1, ¶¶ 21, 34, 35, 41.[5]

37.     The declarations of Cintas' computer forensics experts show that Cintas reviewed the former employees' emails and computers beginning in October 2025. *See* DI 27-15, Zucker Decl., ¶¶ 6-7, 15-16, 20-21; *see also* DI 27-14, Neal Decl., ¶¶ 7-8. Thus, any evidence Cintas had to support its Motion was in Cintas' possession when it filed its Complaint on January 16, 2026. Despite this, Cintas waited more than a year after most of these employees left, five months after conducting its forensic review, and seventy-three days after filing its Complaint to seek injunctive

---

[5] The former employees identified in Cintas' Complaint and Motion signed employment agreements containing mandatory arbitration clauses. *See* DI 1-1 – 1-7, Exs. A-G. However, those arbitration clauses explicitly exclude claims for "declaratory judgment or injunctive relief concerning any provision of Section 4 of this Agreement," which includes covenants related to non-disclosure, non-competition, and non-solicitation. *See id.*

12

relief. If irreparable harm was likely or imminent, Cintas would have acted immediately when the employees left, when it discovered their alleged misconduct, or at minimum, when it filed its Complaint in January 2026. Cintas has no excuse for its delay.

38. Cintas cites *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1264 (3d Cir. 1985) for the proposition that the "relevant inquiry is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued," but this case is distinguishable. First, in that case the plaintiff had made an "ample showing" that the defendants intended to utilize its trade secrets, but no similar showing has been made in this case. Second, the seven-month delay in that case was not unexplained like Cintas' delay here insofar as the plaintiff in *SI Handling* attributed the delay to the defendants' failure to comply with their discovery obligations. *Id.* at 1264. Here, it is undisputed that Cintas never issued any discovery requests nor can it blame ImageFIRST for its delay in seeking injunctive relief.

39. At bottom, the law is clear that Cintas cannot delay seeking relief while simultaneously arguing it will suffer immediate harm. *See Orson, Inc.*, 836 F. Supp. at 312 (denying preliminary injunction for lack of irreparable harm where the movant waited "at least 50 days after . . . acquir[ing] th[e] knowledge" of the alleged harm to seek injunctive relief).[6]

40. Moreover, Cintas' conclusory, speculative allegations of immediate, irreparable harm are based exclusively on its declarants' "information and belief" and speculation and cannot

---

[6] *See also, e.g.*, *New Dana Perfumes Corp. v. The Disney Store, Inc.*, 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) (unexplained two-month delay in sending cease-and-desist letter and further five-month delay before seeking injunctive relief precluded finding of irreparable harm); *Contour Data Sols. LLC v. Gridforce Energy Mgmt. LLC*, No. CV 20-3241, 2021 U.S. Dist. LEXIS 166950, at *27 (E.D. Pa. Sept. 2, 2021) ("Contour filed its motion nearly eight months after the termination of the MMSA, and then requested postponement of the preliminary injunction hearing multiple times. These delays significantly undermine Contour's claim of imminent and irreparable harm."); *Am. Bev. Corp. v. Diageo N. Am., Inc.*, 936 F. Supp. 2d 555, 612 (W.D. Pa. 2013) (seven month delay inexcusable).

justify an injunction for at least three reasons. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) ("the risk of irreparable harm must not be speculative"); DI 27-1, p. 17 (citing DI 27-16, Roettgers Decl., ¶ 23 ("Upon information and belief, ImageFIRST has used, and continues to use, Cintas's misappropriated trade secrets . . . .")).

41.     First, Cintas cannot point to the purported loss of its trade secrets as "*per se* irreparable harm" (*see* DI 27-1, p. 16) because Cintas has not identified any trade secret with particularity or shown that any such trade secret was acquired or used by ImageFIRST. *See Mallet*, 16 F.4th at 380 (finding "no remaining basis to uphold the Court's decision to grant injunctive relief since its irreparable harm determination appears to depend entirely on the Defendants' misappropriation of Mallet's trade secrets," which the court found the defendant failed to identify with particularity).

42.     Cintas has not shown that any trade secret information was improperly downloaded by departing employees or has been or is likely to be used by or disclosed to ImageFIRST. While Cintas argues that "multiple departing employees have already transmitted confidential Cintas materials to personal accounts or to ImageFIRST" (DI 27-1, p. 16), it fails to present the Court with a single piece of evidence showing that any information (let alone a trade secret) was shared with ImageFIRST. *See* DI 1, 27, 38.

43.     Second, while Cintas alleges in conclusory fashion that "Cintas faces ongoing and escalating harm to its competitive position, customer relationships, and market standing," and that "[e]ach competitive bid lost or customer relationship eroded represents harm that cannot be adequately measured or compensated through monetary damages," (*see* DI 27-1, pp. 16-17), Cintas has not identified a single customer or bid it has lost or customer relationship that has suffered as a result of ImageFIRST's purported use of Cintas' trade secret information. Even if

14

Cintas has lost, or is at risk of losing, customers (which there is no evidence to show that is the case), lost customer business is both calculable and compensable in damages. *See Checker Cab of Phila., Inc. v. Uber Techs., Inc.*, 643 F. App'x 229, 232 (3d Cir. 2016) (finding no irreparable harm for "loss of customers," which "is a purely economic harm that can be adequately compensated with a monetary award following adjudication on the merits").

44.    Third, to the extent that Cintas claims irreparable harm based on the "coordinated departures [of former employees that] have deprived Cintas of key leadership personnel" (*see* DI 27-1, p. 18), those employees have already left Cintas (as was their right to do so), and the law is clear that injunctions are intended to prevent *future* harm, not punish *past* conduct.[7] *See First Health Group Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 235-236 (M.D. Pa. 2001) ("A preliminary injunction is not a vehicle through which a plaintiff can seek correction of past wrongs."). Cintas does not seek to enjoin the departed employees from continuing to work for ImageFIRST, conceding that their continued employment does not constitute irreparable harm.

45.    Ultimately, Cintas has failed to meet its burden to make a "clear" showing of irreparable harm to warrant granting a preliminary injunction. *See Stantec Consulting Servs.*, 2021 U.S. Dist. LEXIS 189495, at *22-23, *31-32 (finding lack of irreparable harm and noting that "injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties.") (citations omitted).

---

[7] Cintas cannot rely on Ryan Hartzheim's alleged solicitation of an unidentified former Cintas employee to try to show risk of ongoing irreparable harm (*see* DI 27-1, p. 19 (citing DI 27-13, Poeppelmeier Decl., ¶ 21)), because Cintas fails to show that any such alleged solicitation took place. Also, Mr. Hartzheim lives and was employed by Cintas in California. *See* DI 1-4, Hartzheim's California Employment Agreement. Under California law, Mr. Hartzheim may lawfully solicit Cintas employees. *See* Cal. Bus. & Prof. Code § 16600 *et seq.*; *see also AMN Healthcare v. Aya Healthcare Servs.*, 28 Cal. App. 5th 923, 935 (2018) (prohibiting enforcement of non-compete and non-solicitation provisions purportedly designed to protect trade secrets).

**D.**      <u>**Cintas Fails to Show a Likelihood of Success on the Merits**</u>

46.     Even if Cintas could demonstrate immediate, irreparable harm (it has not), it must still establish "a prima facie case showing a reasonable probability that it will prevail on the merits." *Am. Freedom Def. Initiative v. SEPTA*, 92 F. Supp. 3d 314, 322 (E.D. Pa. 2015) (citations omitted).

47.     Cintas cannot make the necessary showing of likelihood of success on the merits because as shown through ImageFIRST's Motion to Dismiss (DI 25), Cintas' claims amount to nothing more than unsupported, conclusory insinuations and accusations of alleged bad acts by non-parties to this lawsuit, which wholly fail to support any claim against ImageFIRST. Cintas' failure to state a claim against ImageFIRST necessarily means that Cintas has not shown a likelihood of success on the merits. *See Stantec Consulting Servs.*, 2021 U.S. Dist. LEXIS 189495, at *23-24, *29-30 (no likelihood of success on the merits of a former employer's claims after dismissing the unfair competition and civil conspiracy claims); *see also IQVIA, Inc. v. Breskin*, No. 22-cv-2610, 2023 U.S. Dist. LEXIS 47174, at *17-18 (E.D. Pa. Mar. 20, 2023) (no likelihood of success of former employer's claims after new employer's motion to dismiss granted with respect to misappropriation of trade secrets, tortious interference, unjust enrichment, and unfair competition claims).

48.     Cintas' Motion also fails to demonstrate a likelihood of success on the merits on its DTSA, PUTSA, tortious interference, aiding and abetting breach of duty of loyalty, unfair competition, and civil conspiracy claims.

> ### *1.      Cintas Fails to Demonstrate a Likelihood of Success on the Merits of its Trade Secret Misappropriation Claims Under Federal and Pennsylvania Law.*

49.     To state a claim under the DTSA, a plaintiff must allege: "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has

taken reasonable measures to keep secret; (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret." *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (citing 18 U.S.C. §§ 1836(b)(1), 1839(3), 1839(5)). Courts often address DTSA and PUTSA claims together because the elements for stating a PUTSA claim and the definitions of "trade secret" under the PUTSA are substantially similar to the DTSA. *See Mallet*, 16 F.4th at 381 n.19 (collecting cases).[8]

50.     Cintas is unlikely to prevail on its federal and Pennsylvania trade secret claims because Cintas cannot: (a) meet its burden to specifically identify its trade secret with particularity; (b) show how the vague categories of business information alleged to be trade secret are entitled to such protected status; (c) show that ImageFIRST has disclosed, used, or acquired any trade secrets; and (d) circumvent the misappropriation standard by relying on the inevitable disclosure doctrine.

51.     **Failure to Specifically Identify Trade Secrets with Particularity:** In the preliminary injunction context, "it is first and foremost the plaintiff's burden to specifically identify what it contends to be its trade secrets and to demonstrate ***with record evidence*** a significantly better than negligible chance of establishing the existence of those trade secrets." *Mallet*, 16 F.4th at 385 (internal citations and quotations omitted) (emphasis added). At a minimum, this requires a plaintiff to describe its trade secrets "with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons

---

[8] To state a claim under PUTSA, a plaintiff must allege: "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the Plaintiff." *Latuszewski v. VALIC Fin. Advisors, Inc.*, 393 F. App'x. 962, 965 (3d Cir. 2010) (quoting *Moore v. Kulicke & Soffa Indus.*, 318 F.3d 561, 566 (3d Cir. 2003)).

who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Id.* at 382 (quoting *Oakwood*, 999 F.3d at 906). Cintas does not make this showing.

52.     Despite Cintas' retention of forensic experts to review departing employees' email accounts and conduct forensic examinations of departing employees' devices, Cintas does not present the Court with a single document that constitutes a trade secret. *See* DI 27-15, Zucker Decl., ¶¶ 6-7, 15-16, 20-21; *see also* DI 27-14, Neal Decl., ¶¶ 7-8. In fact, far from showing any evidence of trade secret theft, the declaration of Jared Zucker, Cintas' retained forensic expert, states that a review of the emails the departing employees' supposedly forwarded to their personal email accounts "***may need to be conducted for confidential information***." *See* DI 27-15, Zucker Decl., ¶¶ 19, 25 (emphasis added). Either these emails were reviewed prior to Cintas filing its Motion and such review revealed that they do not contain information rising to the level of a trade secret, or Cintas had not reviewed these purported emails for the past four months following the forensic examination and leading up to filing its Motion, thereby conceding the lack of urgency and need for injunctive relief. Regardless, if there was any information that rose to the level of a trade secret in those emails, Cintas would have presented it with its Motion.

53.     Instead of doing so, Cintas bases its request for an injunction on the same vague categories of business information that it alleges to be trade secret in its Complaint. The Third Circuit in *Oakwood* and *Mallet* and this Court in *Heritage Fence* held such vague categories are insufficient to satisfy Cintas' burden to identify its trade secrets with particularity. *Compare* DI 27-1, p. 9 ("[t]hese trade secrets include non-public pricing methodologies, competitive bid strategies, GPO contracting structures and pricing, customer-specific requirements and pricing information, national and global account structures, sales processes and playbooks, proprietary

training programs, internal presentations, market analyses, employee performance criteria, and operational models.") and DI 38, p. 3 (citing DI 27-16, Roettgers Decl., ¶¶ 6–15) *with* DI 25-1, pp. 7-8 (citing DI 1, ¶¶ 53, 61, 76 and discussing *Oakwood*, *Mallet*, and *Heritage Fence*).

54.    Despite not identifying a specific trade secret with particularity, Cintas asks for an injunction to prohibit ImageFIRST from "using, disclosing, or relying upon [any of] Plaintiff's trade secrets or confidential information." *See* DI 27-17. In *Mallet*, the Third Circuit rejected this tactic, and reversed a district court's preliminary injunction order that similarly sought to enjoin the defendants from "using Mallet's confidential, proprietary and/or trade secret information in any respect" because the plaintiff had not adequately identified the allegedly misappropriated trade secrets. 16 F.4th at 377. As in *Mallet*, Cintas' failure to adequately identify the allegedly misappropriated trade secrets with particularity prevents the parties and the Court from "assessing the alleged trade secret information against other information that the record may reveal is publicly available, easily generated, or widely applicable to or learned in the industry" and warrants denying Cintas' Motion. *See id.* at 385 (holding that "[i]f a plaintiff fails to meet that burden, the district court faces the same problem we now have on appeal, and a preliminary injunction for trade secret misappropriation ought not issue.").

55.    Moreover, an injunction against ImageFIRST would be unworkable because ImageFIRST cannot tell from the injunction what "trade secret" information it cannot use. As explained in *Mallet*, Federal Rule of Civil Procedure 65(d) mandates that "[e]very order granting an injunction" set forth the reasons why an injunction is warranted, including stating "its terms specifically[,]" and articulating "in reasonable detail" the conduct it enjoins. *Id.* at 379 (citation omitted). This required particularity is needed "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and [thus] to avoid the possible founding of a contempt citation

19

on a decree too vague to be understood." *Id.* (citation omitted). Granting Cintas' requested injunction when it has not identified its trade secret with any particularity would create such a risk and would enable Cintas to argue violations of an injunction based on ImageFIRST's use of publicly available information. *Id.* at 381 ("Without that information, the injunction order fails to comply with Rule 65(d), and it must be vacated.").

56.    **Failure to Show Secrecy and Independent Economic Value:** Cintas also fails to show how its vague categories of business information "[d]erive[] independent economic value, actual or potential, from not being generally known" to the public. 12 Pa. . C.S. § 5302; 18 U.S.C. § 1839(3). To determine if information is protected as a trade secret, Pennsylvania courts consider the following factors:

> (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (citation omitted); *Mallet*, 16 F.4th at 382 ("Terms such as 'engineering,' 'research and development procedures and materials,' and 'marketing materials' could be applied to almost any corporation in existence.") (citation omitted); *see also Heritage Fence Co.*, No. 24-2650-JFM, 2024 U.S. Dist. LEXIS 221920, at *10 (E.D. Pa. Dec. 9, 2024) ("[C]ustomer service information may be publicly available on a website and names of vendor contacts may be well known in the industry").

57.    In its Motion, Cintas focuses on the measures it allegedly takes to maintain the secrecy of this (unidentified) information (*see* DI 27-1, pp. 9-10) but comes short of providing record evidence that any of the vague, unspecified categories of information are non-public or

could be distinguished from "matters of general knowledge in the trade." *See Oakwood*, 999 F.3d at 906.

58. Cintas' belated attempt to identify "specific *confidential* materials that particular employees accessed, downloaded, and transmitted immediately before joining ImageFIRST" for the first time in Reply (*see* DI 38, p. 3 (citing DI 38-2, Poeppelmeier Supp. Decl., ¶¶ 25-34) (emphasis added)), is deficient because Cintas fails to identify which of the documents are merely "confidential" and which rise to the level of trade secret. *See IQVIA*, 2023 U.S. Dist. LEXIS 47174, at *13 (dismissing trade secret claim that failed to "distinguish between information claimed to be trade secrets and information simply claimed to be confidential") (citing *Mallet*, 16 F.4th at 382 ("While some information falling within those categories may very well include trade secrets, there is a fair probability that many of the categories—and perhaps all of them—also include information that does not qualify for trade secret protection.")).

59. Moreover, Cintas still fails to show that the documents it identifies for the first time its Reply qualify for trade secret protection under the *Bimbo Bakeries*, *Mallet* and *Oakwood* test.[9] For example:

      a. Cintas alleges that David Hilderbrand sent himself a "comprehensive marketing presentation titled 'Building a Better Workday'" that summarizes Cintas's workwear and facility services offerings. DI 38-2, Poeppelmeier Supp. Decl., ¶ 28 (citing DI 38-16, Ex. 13). Cintas admits that "portions of this presentation may be shared selectively with individual customers" and does not allege that it provides these presentations to customers pursuant to NDAs. *Id.* While Cintas alleges that it "does not make the complete compilation publicly available," it does not identify which documents or product offerings are nonpublic or are disclosed publicly / posted on the internet. On the contrary, as shown in ImageFIRST's

---

[9] Despite being central to the issues before the Court, Cintas did not provide the Court with copies of its alleged trade secrets under seal when it filed its May 11, 2026 Reply, so that the parties (and the Court) can determine whether this information qualifies as trade secret. *See* DI 38, n.1 ("Documents containing Cintas's trade secrets are attached to the Poeppelmeier Supplemental Declaration in redacted form."). ImageFIRST reserves all rights to seek relief from the Court to cure the prejudice caused by Cintas' tactics. *See supra n.2.*

Opposition, similar types of comprehensive Cintas marketing presentations summarizing Cintas' workwear and facility services offerings are freely shared by Cintas and its customers and are publicly available. *See* DI 35-31, Cintas 2025 Presentation (Ex. 27); *see also* DI 35-30, Cintas Training & Compliance Catalog (Ex. 26); DI 35-32, Cintas Product Catalog Overview (Ex. 28). In fact, in Cintas' Reply, it presents a comprehensive ImageFIRST marketing brochure Mr. Poeppelmeier obtained at a trade show further demonstrating that these types of marketing materials are not considered confidential, let alone trade secret, in the industry. *See* DI 38-4, Ex. 1.

b. Cintas alleges that Tatum Garrity sent herself a presentation titled "Tatum Garrity Brag Book," which Cintas describes as a "compilation of Garrity's sales accomplishments at Cintas, and includes the names of Cintas non-acute healthcare customers, key contacts at healthcare GPOs, and leading Cintas sales representatives for non-acute healthcare customers." DI 38-2, Poeppelmeier Supp. Decl., ¶¶ 32-33 (citing DI 38-23, Ex. 20). A plain review of Exhibit 20 to Cintas' Reply reveals that this "brag book" was created by Garrity to apply for an internal Non-Acute Specialist sales positions at Cintas, highlight her accomplishments and work references, and was not used to extract or misappropriate Cintas' confidential information, let alone a trade secret. *See* DI 38-23, Ex. 20. Ms. Garrity's reference to key customers she worked with, and the size of those customers is dated and is general business knowledge and know-how that does not rise to the level of a trade secret. In fact, in its Complaint, Cintas freely discloses who its largest customer is in Portland, Maine (Intermed), and alleges that "InterMed's business and the healthcare system is a known prospect for ImageFIRST," thus confirming that customer identities and prospective customers are generally known in this industry. *See* DI 1, ¶ 33.

c. Cintas alleges that Edgar Sandoval sent himself a "sales recruiting memorandum, sales scripts, a GPO recruiting presentation, forecasting tools, and compensation structures." DI 38, p. 5. But Cintas fails to provide record evidence (as opposed to conclusory allegations) demonstrating how this information qualifies as a misappropriated trade secret. *See, e.g.*, *Herley Indus. v. R Cubed Eng'g. LLC*, 2021 U.S. Dist. LEXIS 11949, at *14-18 (E.D. Pa. Jan. 22, 2021) (dismissing trade secret claim under Rule 12(b)(6) for failing to allege specific facts showing how information regarding employees' "skills and compensation" were trade secret or were misappropriated).

d. Cintas alleges that Brian Brosnan "plugged a USB device into his Cintas computer several times immediately prior to his transition to ImageFIRST and *apparently* loaded hundreds of Cintas documents," but fails to provide the Court with any such documents. DI 38, p. 6 (citing DI 38-1, Zucker Supp. Decl., ¶¶ 7-8, 15-20) (emphasis added). Cintas similarly alleges that Nellie Lunetta "accessed Cintas's password-protected systems on her last day of employment and retrieved numerous confidential documents. . . ." DI 27-1, p. 11 (citing DI 27-15, Zucker Decl., ¶¶ 8-13). However, for both individuals, Cintas fails to show that any such

22

documents were in fact loaded onto a USB device or otherwise taken by these individuals, nor does Cintas show that any such documents constitute a trade secret. *See IQVIA*, 2023 U.S. Dist. LEXIS 47174, at *12-14 (dismissing trade secret claim based on a defendant's downloading of nearly 10,000 files to a hard drive where the plaintiff failed to "distinguish between information claimed to be trade secrets and information simply claimed to be confidential").

60.     At bottom, Cintas has failed to "specifically identify what it contends to be its trade secrets and to demonstrate with record evidence a 'significantly better than negligible' chance of establishing the existence of those trade secrets."[10] *Mallet*, 16 F.4th at 385 (citations omitted). Thus, Cintas has not shown a reasonable likelihood of success on the merits of its federal and Pennsylvania trade secret claims.

61.     **Failure to Show Misappropriation by ImageFIRST:** In addition to proving the existence of a trade secret (which it has not), Cintas also must show that ImageFIRST—the only Defendant here—has misappropriated a trade secret. The DTSA and PUTSA define three theories of trade secret misappropriation: acquisition by improper means, disclosure, or use. *See* 18 U.S.C. § 1839(5); 12 Pa. Cons. Stat. § 5302; *see also Freedom Med. Inc.*, 343 F. Supp. 3d at 518, 525 ("[A]n individualized determination is necessary as to whether [the movant] carried its burden of showing an injunction should issue.").

---

[10] While *Mallet* and *Oakwood* provide ample guidance to support the Court's finding that Cintas fails to show a likelihood of success on the merits of its trade secret claim, *Signant Health Holding Corp.* and *Leedsworld, Inc.* also support such an outcome. *See, e.g.*, *Signant Health Holding Corp. v. Debonis*, No. 24-cv-709, 2024 U.S. Dist. LEXIS 107699, at *13 (E.D. Pa. June 18, 2024) (finding that "vague and general references" to "proprietary rater pricing and rater pricing methodology" "f[e]ll short of the particularity required to state a trade secret claim."); *Leedsworld, Inc. v. Hare*, No. 25-cv-220, 2025 U.S. Dist. LEXIS 52198, at *30-31 (W.D. Pa. Mar. 21, 2025) (finding that the alleged trade secrets, which included "customer names and contacts; pricing information; customer sales level spending; marketing strategies, sales strategies, sales staff design; compensation information; strategic plans and account planning processes; and internal cost information" was a "list of general categories of business and technical information," and failed the "standard for specifying a trade secret.").

23

62.    Cintas provides no evidence that ImageFIRST has acquired, disclosed, or used any Cintas "trade secret," never mind by improper means. Cintas unsuccessfully attempts to overcome this flaw by asserting claims about purported actions committed by former employees, without tying this conduct to ImageFIRST.

63.    For example, Cintas' allegations that Mr. Hilderbrand sent himself "*confidential information*" prior to leaving Cintas (DI 27-1, pp. 5, 11 (emphasis added)) was addressed and dismissed in the *Hilderbrand* Arbitration. *See* DI 35-3, Hilderbrand Decl., ¶¶ 16, 21; *see also* DI 35-5, Award, p. 4 ("[Mr. Hilderbrand] provided a reasonable and legitimate explanation for emailing documents to his home address and believably testified he had not used or even opened the files.") As Mr. Hilderbrand explained, many of the documents he sent himself contained his personal information, such as his resume, sales rankings, and his Cintas stock holdings. *See* DI 35-3, Hilderbrand Decl., ¶ 16. The remaining documents he sent to his personal email address did not contain any information that was confidential or proprietary to Cintas, including documents that were publicly available, such as sales brochures, which Cintas provided to customers, prospective customers, and the public at large. *Id.* Mr. Hilderbrand confirmed that he did not forward these documents to his personal email for the purpose of stealing Cintas' information or property or providing any information or documents to ImageFIRST. *Id.*

64.    Similarly, Cintas does not show that Ms. Lunetta sent or took any documents, just that she *may* have "retrieved them" while she was still employed at Cintas. *See* DI 27-1, p. 11 (citing DI 27-15, Zucker Decl., ¶¶ 8-13).[11] And Cintas' allegations regarding Tatum Garrity and

---

[11] Mr. Zucker's declaration does not support Cintas' contention that Ms. Lunetta "retrieved numerous confidential documents." *See* DI 27-1, p. 11. Mr. Zucker declares that "[he] is unable to determine if files were emailed through Yahoo webmail," and he only notes that "web history artifacts of accessing Yahoo Mail compose within a close timeframe of file system last access dates of specific files." DI 27-15, Zucker Decl., ¶ 13.

24

Edgar Sandoval again fail to demonstrate that ImageFIRST ever acquired, disclosed, or used any documents these individuals purportedly could have accessed. *See id.* (citing DI 27-15, Zucker Decl., ¶¶ 17, 24). Indeed, except for scheduling emails related to interviews and sharing a Teams link, Cintas does not identify any communications between Tatum Garrity and Edgar Sandoval and ImageFIRST transmitting documents or information, let alone a "trade secret." *See* DI 27-15, Zucker Decl., ¶¶ 10, 23.

65.     Moreover, while Cintas claims that "emails with attachments were exchanged with bbrosnan25@gmail.com" to suggest that Mr. Brosnan misappropriated Cintas' trade secrets, the chart listing those emails in Mr. Zucker's Supplemental Declaration shows they were all sent <u>from Mr. Brosnan's Gmail account to his Cintas email account</u> and involved sending receipts and pictures, and therefore are the exact opposite of misappropriating information from Cintas systems to external systems. *See* DI 38-1, Zucker Supp. Decl. ¶ 12.

66.     Cintas also unsuccessfully attempts to rely upon an inference of "use" by ImageFIRST to support its request for a preliminary injunction. *See* DI 38, pp. 6-7; *see Oakwood*, 999 F.3d at 912, n.19 (holding that in situations like here "where use of a trade secret is predicated solely on a competitor's access to the plaintiff's former employee" who possessed the trade secrets, the plaintiff must plead "plus factors" that go "beyond allegations of access" to avoid any ambiguity of the lawfulness of the new employer's conduct). However, the purported "plus factors" Cintas cites, such as ImageFIRST allegedly hiring employees into substantially similar roles, purportedly providing extraordinary compensation, and the former employees' purported access to "pricing, customer, and strategy information" or acquisition of information (*see* DI 38, p. 7), do not support an inference of use. Instead, the allegations remain conclusory, are irrelevant to showing misappropriation, and require the Court to go "well beyond inference and into

25

speculation." *See Heritage Fence*, 2024 U.S. Dist. LEXIS 221920, at *13-14.[12] In fact, Cintas cites

no authority demonstrating that such conduct is indicative of use of trade secrets sufficient to

support entry of a preliminary injunction.

67.     As Cintas cannot demonstrate misappropriation by ImageFIRST, its federal and

Pennsylvania trade secret claims fail.

68.     **Failure to Show Sufficient Likelihood or Substantial Threat of Disclosure:**

Recognizing that it has no evidence to show that ImageFIRST has actually misappropriated any

"trade secrets," Cintas argues that the inevitable disclosure doctrine applies in this case because

ImageFIRST has allegedly hired "at least thirteen key Cintas employees . . . into roles just like

their positions at Cintas" where threatened misappropriation is likely. *See* DI 27-1, pp. 10-11, 18-

19; DI 38, p. 8. Cintas' reliance on the inevitable disclosure doctrine is misplaced both on the law

and the facts.

69.     The inevitable disclosure doctrine is a legal principle that can apply in trade secret

cases under Pennsylvania state law[13] to enjoin a *former employee*, not a *subsequent employer* of

that employee. *See Bimbo Bakeries USA, Inc.*, 613 F.3d at 113 ("Overall, we conclude that the

relevant Pennsylvania decisions, viewed as a group, suggest that . . . a court conducting this inquiry

---

[12] Cintas' reliance on the allegation that Nellie Lunetta's "personal knowledge of Cintas Healthcare National Accounts and GPOs, has further enabled ImageFIRST to build a team which competes with Cintas . . . utilizing Cintas's trade secrets, proprietary and confidential information" (DI 1, ¶ 37), is exactly the type of improper leap "to trade-secret misappropriation [that] goes well beyond inference and into speculation." *See Heritage Fence*, 2024 U.S. Dist. LEXIS 221920, at *13-14. For example, Cintas does not allege that a national account program, National Accounts, or GPOs are secret or unique to Cintas. *Id.* To the contrary, Cintas concedes that ImageFIRST has long been in the healthcare space and was servicing healthcare clients before it hired any Cintas employee. *See* DI 1, ¶ 18.

[13] Courts do not apply the inevitable disclosure doctrine to trade secret claims under the federal Defend Trade Secrets Act. *See Imagine Grp. v. Biscanti*, 2025 U.S. Dist. LEXIS 231166, *8 (D. Del. Nov. 24, 2025) ("The language of the DTSA does not support plaintiffs' ability to state a claim under an 'inevitable disclosure' theory").

has discretion to ***enjoin a defendant from beginning new employment*** . . . .") (emphasis added); *see also Colorcon v. Lewis*, 792 F. Supp. 2d 786, 803 (E.D. Pa. 2011) ("***A defendant may be enjoined from taking a new position based on the threat of disclosure of a former employer's trade secrets*** only where the new employment is 'likely to result' in disclosure of the trade secrets.") (emphasis added). Here, Cintas sues only ImageFIRST, and despite identifying several employees as alleged bad actors who will inevitably disclose Cintas' trade secrets, Cintas does not request injunctive relief against them.[14] Cintas cannot circumvent the misappropriation standard by arguing inevitable disclosure against a new employer, especially when there is no evidence ImageFIRST received any Cintas "trade secrets."

70.     Even assuming arguendo the doctrine applies to this case, Cintas has not shown that the doctrine applies to the facts. The discretionary application of the doctrine "depends on a highly fact-specific inquiry into the situation in the case," including consideration of factors such as: (1) the level of competition between the former employer and the new employer; (2) whether the new employer took steps to ensure disclosure would not occur; (3) the similarity of the former employees' position with their new position; (4) whether the former employee was a high-level executive and privy to executive-level decision-making; and (5) whether there was evidence the former employee took trade secrets. *See Bimbo Bakeries USA, Inc.*, 613 F.3d at 113-17; *see also Colorcon*, 792 F. Supp. 2d at 802-04; *CentiMark Corp. v. Jacobsen*, No. 11-1137, 2011 U.S. Dist. LEXIS 136996, at *38-45 (W.D. Pa. Nov. 29, 2011); *Oberg Industries v. Finney*, 382 Pa. Super. 525, 530-32 (1989).

---

[14] Cintas' former employees identified in the Complaint and Motion are bound by employment agreements with mandatory arbitration clauses. *See* DI 1-1 – DI 1-7, Exs. A-G. However, those arbitration clauses explicitly exclude any claims for "declaratory judgment or injunctive relief concerning any provision of Section 4 of this Agreement," which includes covenants related to non-disclosure, non-competition, and non-solicitation. *See id*.

71.    None of these factors weigh in favor of applying the inevitable disclosure doctrine:

72.    First, there is no credible evidence that Cintas and ImageFIRST meaningfully compete. ImageFIRST's business focuses almost exclusively on renting hospital linens nationwide; Cintas only rents linens in three states,[15] and it concedes that its hospital linen business represents "a *de minimis* percentage of [Cintas'] company-wide annual revenue. *See* DI 35-8, Brosnan Discovery Responses, RFP No. 15 (emphasis in original); DI 35-3, Hilderbrand Decl., ¶ 29; DI 35-5, Hilderbrand Arbitration Award ("Award"), p. 3. While Cintas' customers include essentially every industry and customer base possible, ImageFIRST offers services almost exclusively to healthcare facilities and providers. *See, e.g*, *CentiMark Corp.*, 2011 U.S. Dist. LEXIS 136996, at *46 ("[A]lthough the two companies are located in the same region, and both are in the commercial roofing industry, there are sufficient differences in their target markets and business practices to minimize the importance to Nations Roof of any CentiMark information Jacobsen might disclose."); *see also* DI 35-5, Award, p. 3 ("[T]he overlap between [ImageFIRST's and Cintas'] business models is scant.").

73.    Second, Cintas has not shown that any of the departing employees who joined ImageFIRST were "high-level executives" at Cintas and were "involved in or privy to executive-level decision-making at the company." *See Colorcon*, 792 F. Supp. 2d at 804 ("Unlike the employee in *Bimbo Bakeries*, Lewis was not a high-level executive at Colorcon. She undoubtedly

---

[15] After ImageFIRST highlighted in Opposition that Cintas misrepresented its service offerings of "bed linens, towels, and related textile products [(i.e., flat linens)] to hospitals, health systems, and medical facilities" as being a "**nationwide**" offering (*see* DI 27-16, Roettgers Decl., ¶ 4 (emphasis added), Cintas submitted a Supplemental Declaration from Chad Poeppelmeier with its Reply where he confirms that Cintas only offers flat linens in "select markets." DI 38-2, Poeppelmeier Supp. Decl., ¶ 11.

had access to certain confidential information, but there is no evidence that she was involved in or privy to executive-level decision-making at the company.").

74.     Of the thirteen employees named in Cintas' Motion, Cintas only suggests that "Hilderbrand, Brosnan, Ray, Lunetta, and Hartzheim" "possess deep knowledge of Cintas's healthcare business,"[16] but Cintas does not provide any evidence that these employees were "high-level executives" or had any decision-making power at Cintas that would support applying the doctrine to these individuals. *See* DI 27-13, Poeppelmeier Decl., ¶ 8.

75.     Mr. Brosnan was a Service Training Director at Cintas and was not involved in its healthcare division. *See* DI 27-2, ¶ 5 (citing DI 27-4). In addition to Ms. Ray not being an executive at Cintas, she entered into a settlement agreement with Cintas, and Cintas released and dismissed its claims against her, including for alleged theft of trade secrets and violations of her employment agreement with Cintas. DI 35-7, Settlement Agreement, pp. 1-2.

76.     Moreover, the conduct of Ryan Hartzheim and Nellie Lunetta (ImageFIRST employees who worked for Cintas and reside in California) are not subject to the inevitable disclosure doctrine because California has expressly rejected the inevitable disclosure doctrine as it "creates a de facto covenant not to compete" and "runs counter to the strong public policy in California favoring employee mobility." *See Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1462-63 (2002) (internal citations omitted) ("Lest there be any doubt about our holding, our rejection of the inevitable disclosure doctrine is complete."). Cintas provides no argument to support application of the inevitable disclosure doctrine to California based employees.

---

[16] Because Cintas effectively concedes that the other eight employees, who were in lower-level sales roles, were not high-level executives, the inevitable disclosure doctrine neither applies nor supports Cintas' requested injunction. *See, e.g., Freedom Med.*, 343 F. Supp. 3d at 521 ("[W]hile knowing Freedom Medical's pricing schedule would likely benefit Med One's business generally, … a sales representative . . . does not have the power to adjust Med One's prices.").

29

77.    This leaves Mr. Hilderbrand, who Cintas has focused on as its key example of inevitable disclosure. However, in doing so, Cintas misrepresents Mr. Hilderbrand's role at Cintas and ImageFIRST, which further demonstrates that the inevitable disclosure doctrine does not apply to him because Mr. Hilderbrand: (1) was demoted to an ENAM role two years before leaving Cintas, a non-officer role, (DI 35-3, Hilderbrand Decl., ¶ 12; DI 35-5, Award, pp. 1-2); (2) was only promoted to Chief Commercial Officer at ImageFIRST in October 2025 (*more than a year after he left Cintas*) (*see* DI 27-2, ¶ 4 (citing DI 27-3)); and (3) in the *Hilderbrand* Arbitration, based on Cintas' stipulation of undisputed fact, the Arbitrator found that during Mr. Hilderbrand's employment with Cintas, he did not: (a) "work in Cintas' healthcare division," (b) "have healthcare customers assigned to him," (c) "sell flat linens to any of the customers that were assigned to him," or (d) "have access to confidential information regarding the healthcare business" (DI 35-5, Award, p. 3 (citing DI 35-6, May 12, 2025 Joint Stipulation); DI 35-3, Hilderbrand Decl., ¶¶ 14-15).

78.    For these reasons, the Arbitrator found that Cintas failed to show that Mr. Hilderbrand's employment at ImageFIRST would inevitably lead to misappropriation of Cintas' trade secrets. DI 35-5, pp. 2-5. In fact, in the *Hilderbrand* Arbitration, the head of Cintas' Healthcare division, Chad Poeppelmeier, who submitted a declaration in support of Cintas' Motion (*see* DI 27-13), "conceded that it was 'possible' for [Mr. Hilderbrand] to work for ImageFIRST without disclosing Cintas' trade secrets" and that he had not spoken to Mr. Hilderbrand in years. DI 35-3, Hilderbrand Decl., ¶ 7; DI 35-5, pp. 4-5. Cintas provides no arguments to refute these facts or to otherwise support application of the inevitable disclosure doctrine to Mr. Hilderbrand.

79.    Third, Cintas cannot demonstrate that any former employees were hired into similar positions at ImageFIRST. Cintas presents no evidence to support its argument that ImageFIRST

hired "these individuals into roles just like their positions at Cintas" nor does Cintas explain which "individuals" were hired in similar roles. *See* DI 27-1, p. 11 (citing DI 27-16, Roettgers Decl., ¶ 20).[17] Cintas' declarations lack any details regarding the job responsibilities of any of the employees, let alone what industries or divisions the employees worked in, and in fact, misrepresent the nature of the employees' positions at Cintas.[18] For example, in its Motion Cintas identified Mr. Hilderbrand as a "long tenured Cintas Vice President of Sales," and claims that Mr. Hilderbrand possessed knowledge of Cintas' healthcare business (*see* DI 27-13, Poeppelmeier Decl., ¶ 8-9); however, in Reply, Cintas concedes that was not the case. *See* DI 38-2, Poeppelmeier Supp. Decl., ¶ 27 ("Hilderbrand was employed as an Enterprise National Account Manager at Cintas prior to his departure"); *see also* DI 38, p. 10 (Cintas conceding that "Hilderbrand was not assigned to Cintas's healthcare division and did not sell flat linens.")

80.    Fourth, as addressed above, while Cintas alludes to several employees purportedly sending themselves "trade secrets," Cintas provides no evidence showing that these documents were trade secret in nature or intended to be used in future employment. Cintas' forensic review distinctly notes that the confidential nature of the emails or documents are in doubt and that "a secondary review [] may need to be conducted for confidential information" (DI 27-15, Zucker Decl., ¶¶ 19, 25), and does not confirm that any alleged trade secrets were taken by Nellie Lunetta or Brian Brosnan (*see id.* ¶ 13; *see also* DI 38-1, Zucker Supp. Decl., ¶¶ 20). Cintas' failure to point to any employee taking trade secret or confidential information, further demonstrates that

---

[17] Generally, Cintas' citation to Paragraph 20 of Ms. Roettgers' declaration (*and for that matter, the entire declaration*) does not support this contention.

[18] Cintas' further reliance on its outside counsel's declaration attaching the former employees' LinkedIn profiles does not show that "[t]hese employees are currently in roles where use of Cintas's confidential information and trade secrets is inevitable." *See* DI 27-1, p. 5 (citing DI 27-2, Knopp Decl.). This only shows these employees were previously employed by Cintas and then later joined ImageFIRST. This does not carry Cintas' burden.

inevitable disclosure does not apply here. *See, e.g.*, *Colorcon*, 792 F. Supp. 2d at 804 ("[T]here is no credible evidence that Lewis took with her copies of any confidential Colorcon materials or took any action that would indicate she intends to use any Colorcon trade secrets in her new job.").

81.    Finally, ImageFIRST took precautions to ensure that no former Cintas employees would use Cintas' proprietary information during their employment by, for example, requiring that new hires respect and fully comply with any restrictive covenant obligations owed to their former employer and also instructed all new hires to not bring or use any confidential information from their former employer in their employment at ImageFIRST. *See* DI 35-4, Romulus Decl., ¶¶ 4-18 (citing DI 35-33 – 35-43, Offer Letters).

82.    Weighing the factors and considering Cintas' lack of evidence, Cintas has not met its burden of showing any likelihood of disclosure, let alone a sufficient likelihood or substantial threat of disclosure. Cintas' concerns and argument related to inevitable disclosure by former employees who are not parties to this action are entirely speculative and cannot serve as a basis for enjoining ImageFIRST.

### 2.    *Cintas Fails to Demonstrate a Likelihood of Success on the Merits of its Claim for Tortious Interference with Contracts.*

83.    A claim for tortious interference with contract requires: "(1) the existence of a contractual. . . relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship ... (3) the absence of privilege or justification on the part of the defendant; [and] (4) legal damage to the plaintiff as a result of the defendant's conduct . . ." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009) (citations omitted).

84.    First, Cintas has conceded that its employment agreements that it relies on to support its tortious interference claim against ImageFIRST include invalid and unenforceable non-

competition restrictive covenants. *See* DI 36, p. 11 (conceding that the Complaint "candidly alleges" that some restrictive covenants, including the non-compete restrictions, are unenforceable); *see also* DI 1, ¶ 90 (conceding that "some restrictive covenants may not be enforceable in all respects under all the relevant state laws"); *see id.* ¶ 92 (alleging that "most of the terms in the various restrictive covenant agreements" are "legal and enforceable," but only referencing the "non-disparagement covenant, the non-solicitation of employees covenant, and the non-solicitation of customers covenant" and thus, conceding that the non-compete provisions are not enforceable). At bottom, an invalid contract, such as Cintas' admittedly invalid non-compete and other restrictive covenants with its former employees, cannot serve as a basis for a tortious interference cause of action, and as such, Cintas' claim fails on its face. *See, e.g.*, *Deveaux v. Palmer*, 558 A.2d 166, 170 (Pa. Commw. Ct. 1989); *Jones v. City of Philadelphia*, 73 Pa. D. & C. 4th 246, 2005 Phila. Ct. Com. Pl. LEXIS 239, at *39-40 (2005) (same).

85.     Second, by conceding that the non-compete restrictions are unenforceable, Cintas' argument that the competitor's privilege is inapplicable has no merit.[19] Pennsylvania has specifically adopted the "competitor's privilege," "which recognizes that competitors, in certain circumstances, are privileged in the course of competition to interfere with others' prospective contractual relationships." *Acumed LLC*, 561 F.3d at 215. The competitor's privilege prevents a plaintiff from bringing a tortious interference claim based on interference with at-will employment contracts (such as Cintas' employment agreements attached to the Complaint) so long as a defendant does not employ wrongful means, does not create or continue an unlawful restraint of

---

[19] Cintas' reliance on *Vertex v. Avalara* and *Acclaim Systems v. Infosys*, is misguided because in both cases, the courts found the competitors' privilege inapplicable given that the employees at issue <u>were</u> bound by valid non-compete agreements, which is not the case here. *See* 2024 U.S. Dist. LEXIS 62777, *10 (E.D. Pa. Apr. 5, 2024); 2015 U.S. Dist. LEXIS 90937, at *8-10 (E.D. Pa. July 14, 2015).

trade, and the defendant's purpose is at least partially to advance its own competitive interest. *Id.* (citing Restatement (Second) of Torts § 768)); *see Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 633-34 (1957) (noting that the inducement of employees to work with a competitor is not unlawful if the purpose of the inducement is not to cripple a competitor's business, but rather to "obtain the services of particularly gifted or skilled employees"); *see also Albee Homes, Inc. v. Caddie Homes, Inc.*, 417 Pa. 177, 182 (1965) ("[O]ffering of employment to a person under a contract, terminable at the will of either, with another is not actionable in and of itself."). Cintas, much like the plaintiff in *Albee Homes*, does not sufficiently show that ImageFIRST's intent behind any purported recruitment of Cintas at-will employees was to specifically harm Cintas.

86.    Third, Cintas' unsupported arguments do not show that ImageFIRST had the specific intent to induce, or actually induced, any former employee to breach their employment agreements. *See Am. Osteopathic Ass'n* v. *Am. Bd. of Internal Med.*, 555 F. Supp. 3d 142, 150-51 (E.D. Pa. 2021) (dismissing "threadbare" tortious interference allegations lacking details about "specific acts taken" to induce a breach, instead of concretely detailing the "who or how" of the matter). For example, Cintas does not allege how the non-solicitation or non-disparagement provisions have been breached by any former employee, let alone through ImageFIRST's inducement and specific intent to harm Cintas. Cintas does not allege a single lost client or disparaging statement. Not one.

87.    Cintas argues that ImageFIRST offered departing employees "extraordinary" or "supercompetitive" compensation to intentionally encourage their breach, but the argument is based on pure speculation and hearsay. *See* DI 27-1, pp. 13-15. Cintas points to a rumor as evidence: that Mr. Poeppelmeier "heard" Mr. Brosnan received a "signing bonus approaching $1

million" to join ImageFIRST. *See* DI 27-13, Poeppelmeier Decl., ¶ 15. As confirmed by ImageFIRST's HR Department, this rumor is false. DI 35-4, Romulus Decl., ¶¶ 8-9.

88.     Cintas alleges without evidence that ImageFIRST "encouraged departing employees to conceal their planned employment while still at Cintas" (*see* DI 27-1, p. 12 (citing DI 27-13, Poeppelmeier Decl., ¶ 23), but the record shows that ImageFIRST told the departing employees the opposite, instructing them to "fully comply" with their "obligations to provide advanced notice of your resignation and intent to join us, if any."[20] *See* DI 35-33 – 35-43, Offer Letters.

89.     Cintas' reliance on ImageFIRST's alleged promise "to cover attorneys' fees for the departing employees" as evidence of ImageFIRST inducing breach of departing employees' employment agreements is insufficient. *See* DI 27-1, p. 12. Even if ImageFIRST agreed to indemnify the employees that Cintas sued, including Mr. Hilderbrand, there is nothing improper about employees obtaining indemnification for their attorneys' fees, especially given Cintas' overwhelming resources and willingness to sue. *See* DI 35-5, Award, p. 4 ("Given the instant action, Hilderbrand acted presciently and prudently in obtaining an indemnification assurance from ImageFIRST.").

90.     Accordingly, Cintas has failed to show a likelihood of success on the merits of its tortious interference claim.

---

[20] None of the contracts attached to Cintas' Complaint include any provision mandating that departing employees inform Cintas of their next employer. *See* D1-1 – DI 1-7, Exs. A-G; *see also* DI 35-5, Award, p. 4 (recognizing that Mr. Hilderbrand had no obligation to inform Cintas of his future employment plans); DI 35-3, Hilderbrand Decl., ¶ 22.

### 3. *Cintas Fails to Demonstrate a Likelihood of Success on the Merits for the Rest of its Claims.*[21]

91.     Cintas fails to demonstrate a likelihood of success on the merits of its claims for aiding and abetting breach of duty of loyalty, unfair competition, and civil conspiracy. In support of these claims, Cintas relies on the same allegations of wrongdoing by ImageFIRST that Cintas relies on to support its trade secret and tortious interference claims (*see* DI 27-1, pp. 13-15), which as discussed above, Cintas has failed to establish a likelihood of success on the merits. Moreover, Cintas failed to address these claims in its Reply leaving ImageFIRST's arguments against each of these claims unrefuted. *See* DI 38.

92.     **Aiding and Abetting:** To adequately plead an aiding and abetting claim, a plaintiff must allege that there was (1) a breach of a duty owed to another; (2) knowledge of the breach on the part of the aider and abettor; and (3) "substantial assistance or encouragement by the aider and abettor in effecting that breach." *DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp. 3d 225, 242 (E.D. Pa. 2017) (citation omitted). If a plaintiff cannot establish a cause of action for an underlying tort, "the aiding and abetting claim must also fail." *Liberty Mut. Grp., Inc. v. 700 Pharm., LLC*, 270 A.3d 537, 555 (Pa. Super. Ct. 2022). Cintas cannot satisfy any of the elements of an aiding and abetting claim.

93.     First, Cintas does not provide any factual details showing that a single customer or employee was wrongfully solicited by a former Cintas employee, or that the former Cintas employees' employment with ImageFIRST was wrongful. At-will employees' decision to explore leaving Cintas and to join a different company while employed by Cintas is not a breach of fiduciary duty. *See Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 667 (E.D. Pa. 2014)

---

[21] Cintas seeks preliminary injunctive relief on all its claims except tort of another (Count V) and unjust enrichment (Count VI). *See* DI 27-1, pp. 7-15.

("[E]mployees at will do not breach a fiduciary duty to the employer by making preparations to compete upon termination of employment provided the employee does not use the confidential information of his employer, solicit the customers of his employer, or otherwise engage in conduct directly damaging his employer during the period of employment."). As Cintas cannot establish an underlying breach of fiduciary duty, the aiding and abetting claim against ImageFIRST fails.

94.    Second and third, Cintas does not show that ImageFIRST knew that any departing employees took any confidential information or engaged in any other breach of fiduciary duty, let alone that ImageFIRST provided such employees with "substantial assistance" in doing so. As evidence of wrongdoing, Cintas argues that "ImageFIRST instructed the employees to hide their future employment, offered extraordinary compensation to induce disloyal conduct, and promoted or accepted the transfer, retention, or use of Cintas's confidential information." *See* DI 27-1, pp. 13-14. These speculative and conclusory allegations have been thoroughly addressed and refuted above and do not support Cintas' aiding and abetting claim. *See Mitchell Partners, L.P. v. Irex Corp.*, No. 08-CV-04814, 2010 U.S. Dist. LEXIS 103248, at *28-29 (E.D. Pa. Sept. 29, 2010)[22] (dismissing plaintiff's claim for aiding and abetting breach of fiduciary duty, recognizing that the plaintiff failed to allege "how, when, and where" the defendants gained knowledge of the breach and ultimately held that "[s]uch 'threadbare recitals of the elements' do not set forth 'sufficient factual matter' to survive a motion to dismiss.")

95.    Cintas is unlikely to succeed on its aiding and abetting claim.

96.    **Unfair Competition:** Pennsylvania prohibits unfair competition tort claims that act merely "'as a virtual catch-all for any form of [alleged] wrongful business conduct.'" *Giordano*

---

[22] *Rev'd on other grounds*, 656 F.3d 201 (3d Cir. 2011), *and rev'd and remanded on other grounds*, 497 F. App'x 259 (3d Cir. 2012).

*v. Claudio*, 714 F. Supp. 2d 508, 522 (E.D. Pa. 2010) (quoting *USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593, 619 (W.D. Pa. 2000)); *see also Larry Pitt & Associates v. Lundy Law, LLP*, 57 F. Supp. 3d 445, 456 (E.D. Pa. 2014) ("Unfair competition is not a catch-all for any form of [alleged] business misconduct."). To establish unfair competition, Cintas must show that ImageFIRST engaged in "trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and[/or] unlawful use of confidential information." *Giordano*, 714 F. Supp. 2d at 521 (internal quotation omitted).

97.    In support of its unfair competition claim, Cintas relies on the same alleged conduct that it relies on to support its trade secret, tortious interference, and aiding and abetting claims. *See* DI 27-1, p. 14. As discussed above, Cintas has not shown a likelihood of success on the merits of its misappropriation of trade secrets, tortious interference, or aiding or abetting claims, and thus, Cintas' reliance on this same conduct to support its unfair competition claim similarly fails to show a likelihood of success on the merits. *See IQVIA*, 2023 U.S. Dist. LEXIS 47174, at *17; *Stantec Consulting Servs.*, 2021 U.S. Dist. LEXIS 189495, at *14-15 (applying *Albee Homes* and finding that unsupported allegations that the defendant induced the plaintiff's employees to leave, including allegations of pre-departure communications between the defendant and said employees, was insufficient to state a claim for unfair competition).

98.    **Civil Conspiracy:** Under Pennsylvania law, a civil conspiracy claim requires proof of "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) (citation omitted). Cintas also must

38

show that the conspirators acted with "malice," that is, solely for the purpose of injuring plaintiff. *See Doltz v. Harris & Assocs.*, 280 F. Supp. 2d 377, 389 (E.D. Pa. 2003); *Bro-tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009).

99.     First, Cintas did not allege any type of concerted action on the part of ImageFIRST and former Cintas employees.

100.     Second, the Complaint not only does not allege malice on the part of ImageFIRST and the departing Cintas employees, but it also negates any inference that ImageFIRST acted with malice by repeatedly alleging that ImageFIRST's intent behind its purported actions, including the object of the conspiracy, was to benefit ImageFIRST, and not solely to injure Cintas. *See* DI 1, ¶ 151 ("[t]he object of the conspiracy was to unfairly compete with Cintas and accelerate ImageFIRST's growth"); *see also, e.g., id.* ¶ 71 ("ImageFIRST has used and intends to continue to use the stolen information to accelerate its market position."); ¶ 112 ("ImageFIRST acted intentionally [and] knowingly… with the purpose of … accelerating its growth.").

101.     Courts consistently find that the element of malice is negated by "a showing that a person acted for professional reasons, and not solely to injure the plaintiff." *See DePuy Synthes Sales, Inc.*, 259 F. Supp. 3d at 247-49 (collecting cases); *see also Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 U.S. Dist. LEXIS 134886, at *129 (E.D. Pa. Sept. 19, 2012) ("As malice can only be found when the *sole* purpose of the conspiracy is to injure the plaintiff, a showing that a person acted for professional reasons, and not solely to injure the plaintiff, negates a finding of malice."); *Simon v. Unumprovident Corp.*, No. 99-6638, 2002 U.S. Dist. LEXIS 9331, at *29 (E.D. Pa. May 23, 2002) ("[W]here the facts show that a person acted to advance his own business

39

interests, those facts constitute justification and negate any alleged intent to injure.").[23] Thus, like in *DePuy*, "the complaint in this matter explicitly alleges that an aim of the conspiracy, and not merely a side effect, was to benefit [ImageFIRST]" thereby "bel[ying] any notion that [ImageFIRST] w[as] acting solely to injure plaintiff." *See DePuy Synthes Sales, Inc.*, 259 F. Supp. 3d at 248-49. For this reason alone, Cintas is unlikely to succeed on its civil conspiracy claim.

102.    Third, "[a] civil conspiracy claim depends upon the commission of an underlying tortious act; it is not an independent tort." *Synthes (USA) v. Globus Med., Inc.*, No. 04-CV-1235, 2005 U.S. Dist. LEXIS 19962, at \*28 (E.D. Pa. Sept. 14, 2005) (citation omitted). The alleged tortious acts referenced in the conspiracy count in the Complaint are the same actions supporting Cintas' other tort claims. *See* DI 1, ¶ 152. As discussed above, Cintas has not shown a likelihood of success on the merits of its other tort claims, and thus, Cintas' derivative conspiracy claim similarly fails.

**E.    Cintas Fails to Establish the Other Factors Needed for Injunctive Relief.**

103.    Cintas' failure to show immediate, irreparable harm or a likelihood of success on the merits is dispositive on its Motion, as these "gateway factors" are the "most critical" requirements for a preliminary injunction in the Third Circuit. *Reilly*, 858 F.3d at 179; *id.* at 176 ("we have repeated that a district court—in its sound discretion—should balance those four factors

---

[23] Certain courts in the Third District have found that mixed motives do not preclude a finding of malice; however, this is a minority view. *See Gridkor, LLC v. Collins*, 2025 U.S. Dist. LEXIS 152818, at \*30 (E.D. Pa. Aug. 8, 2025) (collecting cases). The majority of courts in the Eastern District apply the long-standing precedent cited in ImageFIRST's Motion, which has been adopted by the Third Circuit, and holds that "[m]alice requires an allegation that the sole purpose of the conspiracy was to injure the plaintiff." *DePuy Synthes Sales,* 259 F. Supp. 3d at 247-49 (collecting cases); *see also Sarpolis v. Tereshko*, 26 F. Supp. 3d 407, 423-24 (E.D. Pa. 2014) (declining to infer malice where complaint explicitly averred that "all parties reaped financial or career benefits, at Plaintiff's expense" as a result of the alleged conspiracy), *aff'd*, 625 F. App'x 594, 601 (3d Cir. 2016); *NRA Grp., LLC v. Durenleau*, 154 F.4th 153, 172 (3rd Cir. 2025) (holding that the showing of malice "is a demanding standard: malicious intent must be the 'sole purpose' of the conspiracy").

so long as the party seeking the injunction meets the threshold on the first two."). Thus, while the Court need not consider the remaining two factors—"(3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued [(*i.e.*, the balance of equities)]; and (4) that the public interest weighs in favor of granting the injunction"—Cintas also fails to establish that these factors support granting the Motion. *See Greater Phila. Chamber of Commerce*, 949 F.3d at 133.

104.   **Balance of Equities:** Because Cintas cannot satisfy the first two gateway factors, "the harm to [ImageFIRST] if injunctive relief is granted is necessarily greater." *See Stantec Consulting Servs., Inc.*, 2021 U.S. Dist. LEXIS 189495, at *35; *see also Cont'l Grp., Inc.*, 614 F.2d at 359 ("injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued to restrain one from doing what he is not attempting and does not intend to do.")

105.   Moreover, in balancing the equities, the Court must "balance the harm that will occur to [Cintas] from the denial of the preliminary injunction with the harm that [ImageFIRST] will incur if the injunction is granted." *TGaS Advisors, LLC v. Zensights, LLC*, No. 16-1870, 2016 U.S. Dist. LEXIS 100768, at *10 (E.D. Pa. Aug. 1, 2016) (internal quotation omitted). In this context, "[d]amage to [the non-movant] business's reputation and credibility" are essential factors. *Id.* (citing *B.P. Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000)).

106.   On one hand, there is no evidence that Cintas will suffer irreparable harm or that ImageFIRST has engaged in any wrongdoing warranting a preliminary injunction. On the other hand, a preliminary injunction against ImageFIRST would still inflict great harm on ImageFIRST's reputation and credibility in the marketplace. *See TGaS Advisors, LLC*, 2016 U.S. Dist. LEXIS 100768, at *11 (holding that an injunction would harm the non-movant where, as

41

here, "the requested injunction . . . [would] sen[d] a message to the public that [the non-movant] cannot be trusted with sensitive information.").

107.    **Public Interest Considerations:** Cintas must also establish is that an injunction would not be adverse to the public interest. *Reilly*, 858 F.3d at 178. While it is true that the public has an interest in protecting legitimate trade secrets, the Third Circuit has made clear that there is *greater* public interest in free competition where legal rights are not invaded:

> [T]here is a generalized public interest in 'upholding the inviolability of trade secrets and enforceability of confidentiality agreements.' Additionally, ***there is a public interest in employers being free to hire whom they please and in employees being free to work for whom they please. Of these latter two interests, Pennsylvania courts consider the right of the employee to be more significant***.

*Bimbo Bakeries*, 613 F.3d at 119 (emphasis added) (citations omitted).

108.    Enjoining ImageFIRST is contrary to the public interest because it would stifle competition and employee mobility in the absence of evidence that ImageFIRST's actions of hiring former Cintas employees were improper or that ImageFIRST engaged in any wrongdoing with regard to Cintas' alleged trade secrets. *See Stantec Consulting Servs., Inc.*, 2021 U.S. Dist. LEXIS 189495, at *38 (because the movant failed to "produce[] evidence of 'unfair' competition" or that "confidential information [wa]s being improperly used or disclosed, the public interest in preserving competition weighs in favor of denying the injunction").

## IV.    CONCLUSION

109.    For these reasons, ImageFIRST respectfully requests that the Court deny Cintas' Motion for Preliminary Injunction (DI 27).

42

Dated: May 15, 2026

Respectfully submitted,

**BAKER & MCKENZIE LLP**

/s/ *William Dugan*

Robin Samuel (admitted *pro hac vice*)
10250 Constellation Blvd., Suite 1850
Los Angeles, CA  90067
Tel:  310 201 4728
Fax: 310 201 4721
Email: robin.samuel@bakermckenzie.com

William Dugan (admitted *pro hac vice*)
300 East Randolph Street, Suite 5000
Chicago, IL  60601
Tel: 312 861 8000
Fax: 312 861 2899
Email: william.dugan@bakermckenzie.com

Allen Al-Haj (admitted *pro hac vice*)
1900 North Pearl Street, Suite 1500
Dallas, TX  75201
Tel: 214 978 3000
Fax: 214 978 3099
Email: allen.alhaj@bakermckenzie.com

**WILENTZ GOLDMAN & SPITZER, P.A.**

/s/ *Daniel S. Bernheim (with permission)*

Daniel S. Bernheim, 3d
Two Penn Center, Suite 910
Philadelphia, PA 19102
Tel: 215 636 4468
Email: dbernheim@wilentz.com

*Attorneys for Defendant*
*ImageFIRST Healthcare Laundry Specialists,*
*LLC*

43