## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

-----------------------------------------------------------------x

Cintas Corporation,

                Plaintiff,

                -against-

ImageFIRST Healthcare Laundry Specialists, LLC,

                Defendant.

Civ. A. No. 2:26-cv-00302-JFM

-----------------------------------------------------------------x

## **PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

Introduction.................................................................................................................1

Findings of Fact .........................................................................................................2

I.    The Parties .......................................................................................................2

II.    Cintas's Healthcare Business ...........................................................................2

III.    Cintas Competes with ImageFIRST .................................................................6

IV.    Cintas's Trade Secrets and Confidential Information .......................................7

V.    Cintas's Measures to Protect Confidential Information.....................................8

VI.    Departures of Cintas Employees to ImageFIRST.............................................9

VII.    Harm to Cintas ...............................................................................................15

Conclusions of Law ..................................................................................................16

I.    Legal Standard ...............................................................................................16

II.    Cintas Is Likely to Succeed on the Merits .....................................................17

    A.    Trade Secrets Misappropriation ...........................................................17

        1.    Cintas Has Identified Protectable Trade Secrets.......................17

        2.    Cintas Has Plausibly Pleaded Acquisition, Use, and Threatened Use .......20

        3.    Cintas and ImageFIRST Compete in the Healthcare Market ...................23

    B.    Tortious Interference with Contract ......................................................24

III.    Cintas Will Suffer Irreparable Harm Absent Injunctive Relief........................26

    A.    Loss of Trade Secret Protection Constitutes Per Se Irreparable Harm ..................27

    B.    Cintas Faces Ongoing Loss of Competitive Position and Customers....................27

    C.    The Harm to Cintas Is Difficult to Quantify and Impossible to Remedy Fully.....28

    D.    The Risk of Future Misappropriation is Ongoing and Imminent ..........................29

IV.    The Balance of Equities Favors Injunctive Relief............................................31

V.    The Public Interest Supports Injunctive Relief.................................................33

CONCLUSION..........................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acclaim Sys., Inc. v. Infosys, Ltd.*,
2015 WL 4257463 (E.D. Pa. July 14, 2015)............................................................26

*Adler, Barish, Daniels, Levin & Creskoff v. Epstein*,
393 A.2d 1175 (Pa. 1978)......................................................................24, 25

*Air Prods. & Chems., Inc. v. Johnson*,
442 A.2d 1114 (Pa. Super. 1982)...........................................................22, 23, 30

*Allied Orthopedic Assocs., Inc. v. Leonetti*,
2018 WL 4051801 (E.D. Pa. Aug. 24, 2018) .........................................................33

*Arnold's Off. Furniture, LLC v. Borden*,
2022 WL 523602 (E.D. Pa. Feb. 22, 2022) ..........................................................19

*BIEC Int'l, Inc. v. Glob. Steel Servs., Ltd.*,
791 F. Supp. 489 (E.D. Pa. 1992) ................................................................18, 19, 20

*Bimbo Bakeries USA, Inc. v. Botticella*,
2010 WL 571774 (E.D. Pa. Feb. 9, 2010) ...........................................................27

*Bimbo Bakeries USA, Inc. v. Botticella*,
613 F.3d 102 (3d Cir. 2010)...................................................................... passim

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*,
229 F.3d 254 (3d Cir. 2000)........................................................................15, 31

*Bradley v. Pittsburgh Bd. of Educ.*,
910 F.2d 1172 (3d Cir. 1990)......................................................................15

*Cerro Fabricated Prods., LLC v. Solanick*,
300 F. Supp. 3d 632 (M.D. Pa. 2018)..............................................................16

*Crum v. Bridgestone/Firestone N. Am. Tire, LLC*,
907 A.2d 578 (Pa. Super. Ct. 2006).................................................................18

*Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*,
501 F.2d 917 (3d Cir. 1974)......................................................................15

*DePuy Synthes Sales, Inc. v. Globus Med., Inc.*,
259 F. Supp. 3d 225 (E.D. Pa. 2017) ...............................................................26

*Emergency Care Rsch. Inst. v. Guidant Corp*,
2007 WL 2702455 (E.D. Pa. Sept. 12, 2007) ....................................................17

*FMC Corp. v. Control Sols., Inc.*,
369 F. Supp. 2d 539 (E.D. Pa. 2005) .............................................................33

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
730 F.2d 61 (2d Cir. 1984)..........................................................................26, 27

*Forbes v. Jingjingwang*,
2025 WL 3691079 (W.D. Pa. Dec. 19, 2025)................................................33

*Freedom Med. Inc. v. Whitman*,
343 F. Supp. 3d 509 (E.D. Pa. 2018) .......................................................17, 18

*Gallagher v. Ohio Cas. Ins. Co.*,
2014 WL 1386990 (E.D. Pa. Apr. 9, 2014) ..................................................24

*Ilapak v. Young*,
2020 WL 2787689 (E.D. Pa. May 29, 2020) ...........................................21, 22

*In re Arthur Treacher's Franchisee Litig.*,
689 F.2d 1137 (3d Cir. 1982)........................................................................15

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974).......................................................................................33

*Kos Pharms., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004)......................................................................16, 31

*Liberty Mut. Ins. Co. v. Gemma*,
301 F. Supp. 3d 523 (W.D. Pa. 2018)........................................................24, 25

*M3 USA Corp. v. Hart*,
516 F. Supp. 3d 476 (E.D. Pa. 2021) ........................................................24, 25

*Mazzoni Ctr. v. LCF Grp., Inc.*,
2024 WL 4821475 (E.D. Pa. Nov. 18, 2024) ..............................................16

*Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*,
69 F. App'x 550 (3d Cir. 2003)..................................................................26, 28

*O.D. Anderson, Inc. v. Cricks*,
815 A.2d 1063 (Pa. Super. Ct. 2003)........................................................17, 32

*Oakwood Labs. LLC v. Thanoo*,
999 F.3d 892 (3d Cir. 2021)..........................................................................27

*Oburn v. Shapp*,
   521 F.2d 142 (3d Cir. 1975)................................................................................................15

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
   143 F.3d 800 (3d Cir. 1998)................................................................................................32

*Par Pharm., Inc. v. QuVa Pharma, Inc.*,
   764 F. App'x 273 (3d Cir. 2019) ...........................................................................16, 28, 31

*Reilly v. City of Harrisburg*,
   858 F.3d 173 (3d Cir. 2017)................................................................................................15

*SI Handling Sys., Inc. v. Heisley*,
   753 F.2d 1244 (3d Cir. 1985)................................................................................16, 19, 33

*Synthes (USA) v. Globus Med., Inc.*,
   2007 WL 2043184 (E.D. Pa. July 12, 2007).......................................................................24

*Teva Pharm. USA, Inc. v. Sandhu*,
   291 F. Supp. 3d 659 (E.D. Pa. 2018) ..................................................................................17

*Trs. of Gen. Assembly of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*,
   527 F. Supp. 3d 722 (E.D. Pa. 2021), *aff'd sub nom. Trs. of Gen. Assembly of
   Church of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, 2021 WL
   6101254 (3d Cir. Dec. 21, 2021) .........................................................................................16

*Verizon Commc'ns Inc. v. Pizzirani*,
   462 F. Supp. 2d 648 (E.D. Pa. 2006) ..................................................................................26

*Vertex, Inc. v. Avalara, Inc.*,
   2024 WL 1484608 (E.D. Pa. Apr. 5, 2024), *reconsideration denied*, 2024 WL
   5671130 (E.D. Pa. 2024)......................................................................................................26

*Wexler v. Greenberg*,
   399 Pa. 569 (1960)...............................................................................................................33

*Witkowski v. Welch*,
   173 F.3d 192 (3d Cir. 1999).................................................................................................24

**STATUTES**

12 Pa. C.S.A. § 5301, *et seq.*.......................................................................................... passim

18 U.S.C. § 1836.............................................................................................................. passim

18 U.S.C. § 1839..................................................................................................................17

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 65(a) ........................................................................33

Pursuant to the Court's April 7, 2026 Order (ECF 30), Plaintiff Cintas Corporation ("Cintas" or "Plaintiff") respectfully submits the following proposed findings of fact and conclusions of law.

## **<u>INTRODUCTION</u>**

Cintas filed this lawsuit on January 16, 2026, seeking, *inter alia*, declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees and costs, stemming from violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* (the "DTSA"), and the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. § 5301, *et seq.* (the "PUTSA"), and conduct constituting tortious interference with contract, aiding and abetting breach of the duty of loyalty, tort of another, unjust enrichment, unfair competition, and civil conspiracy. ECF 1.

On March 30, 2026, Cintas filed a motion for preliminary injunction, seeking an order providing that: "(1) ImageFIRST is prohibited from using, disclosing, or relying upon Cintas's trade secrets or confidential information; (2) ImageFIRST must return or destroy all Cintas materials and certify compliance; (3) ImageFIRST is prohibited from soliciting Cintas customers using Cintas confidential information; (4) ImageFIRST is prohibited from soliciting Cintas employees through use of Cintas confidential information and through inducement of contractual breaches; and (5) ImageFIRST must preserve all evidence relevant to this action." ECF 27-1 at 23.

The Court held an evidentiary hearing on May 19, 2026. ECF 30. Based on the evidence presented at the hearing, as well as pre-hearing submissions from the parties, the Court makes the following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

**I.     The Parties.**

1.      Cintas is a Washington corporation with its principal place of business located in Mason, Ohio. ECF 1 ¶ 11. Cintas is a national provider of business support services, including uniform, linen, and facility services. *Id.* ¶ 16; ECF 27-16 ¶ 4.

2.      ImageFIRST Healthcare Laundry Specialists LLC ("ImageFIRST" or "Defendant") is a citizen of the state of Pennsylvania with its principal place of business located in Pennsylvania. ECF 35-3 ¶ 28.

**II.     Cintas's Healthcare Business.**

3.      Cintas's business is organized across multiple operating segments and market segments, including Rental, First Aid and Safety, Fire Protection, and Design Collective sales organizations, as well as strategic market segments (*e.g.*, Education, Public Sector, and Hospitality). ECF 38-3 ¶ 4. Cintas's healthcare strategic market is a dedicated sales vertical within the strategic markets segment of Cintas's business that specializes in serving healthcare customers. *Id.*

4.      Within Cintas, the healthcare strategic market is one of Cintas's fastest-growing and most strategically important business segments. ECF 1 ¶ 16; ECF 27-13 ¶ 5; ECF 27-16 ¶ 4; ECF 38-2 ¶ 6. Through this business segment, Cintas provides uniform, linen and related facility services to hospitals, health systems, and medical facilities nationwide. ECF 1 ¶ 16; ECF 27-16 ¶ 4.

5.      The healthcare market represents a significant portion of annual revenue for Cintas. ECF 1 ¶ 17; ECF 27-16 ¶ 5. Cintas has invested decades of financial, operational, and intellectual capital developing its sales processes, service models, pricing architecture, training systems,

vendor relationships, logistics structure and operations, and customer-specific implementations in this market. ECF 1 ¶ 17; ECF 27-16 ¶ 5.

6.      Cintas's healthcare strategic market was one of the first market segments that Cintas launched over fifteen years ago. ECF 38-3 ¶ 5. Since then, Cintas has developed a specialized healthcare go-to-market strategy, *i.e.* Cintas's comprehensive plan to bring its products and services to the healthcare market or customer, built Group Purchasing Organization ("GPO")[1] contracting relationships, created pricing models tailored to GPO and integrated delivery network ("IDN")[2] structures, deployed proprietary inventory-tracking technology for scrub or microfiber dispensing programs, and designed customer-specific implementation and renewal strategies. *Id.* ¶ 6; ECF 38-2 ¶ 6. These capabilities were developed internally over more than fifteen years and are not publicly available. ECF 38-3 ¶ 6; ECF 38-2 ¶ 5.

7.      Since the launch of Cintas's healthcare strategic market, Cintas has grown its healthcare business to generate over $700 million in annual revenue. ECF 38-3 ¶ 5; ECF 38-2 ¶¶ 5, 7. The healthcare strategic market currently has approximately twice the growth expectations of other Cintas business segments. ECF 38-3 ¶ 5; ECF 38-2 ¶ 6.

8.      The healthcare market requires a level of specialization that differentiates it from Cintas's other markets. ECF 38-3 ¶ 7; ECF 38-2 ¶ 7. Healthcare customers have needs relating to product quality, infection-prevention requirements, delivery and service reliability, and regulatory compliance. ECF 38-3 ¶ 7; ECF 38-2 ¶ 7. Succeeding in healthcare requires understanding how

---

[1] GPOs are entities that help providers (like hospitals, nursing homes, and clinics) aggregate their purchasing volume to negotiate bulk discounts on medical supplies, pharmaceuticals, and services with manufacturers and distributors.

[2] IDNs are corporate networks of healthcare facilities (such as hospitals, clinics, and physician groups) that operate under unified governance.

healthcare facilities operate, who makes purchasing decisions, how contracts are structured through GPOs and IDNs, and how to service customers over long contract terms. ECF 38-3 ¶ 7; ECF 38-2 ¶ 7. Consistent with this specialization, pricing in the healthcare segment is proprietary and reflects significant investment, including the development of tailored pricing models, customer-specific strategies, and insights derived from experience in the market. ECF 38-3 ¶ 7. This pricing information is not publicly available, is closely guarded, and constitutes confidential information at Cintas. *Id.* Pricing for private-sector contracts, especially in the healthcare space, is individually negotiated, highly flexible, and often incorporates customer-specific considerations. *Id.* ¶ 14. Private healthcare customers may receive volume discounts, rebates, or other financial incentives, even where the customer participates in a private-sector GPO. *Id.* As a result, any prices made public through public-sector contracts are not directly comparable to the pricing structures applicable to private-sector healthcare customers. *Id.* Additionally, some of Cintas's private-sector contracts include provisions mandating that their terms be kept confidential.

9.      The experienced leaders and personnel within the healthcare strategic market possess institutional knowledge that cannot be quickly replaced. ECF 38-2 ¶ 8. It takes years to learn the business—the customers, products, pricing, operations, GPO landscape, and go-to-market approach. *Id.* Senior leaders understand not only what Cintas sells but how Cintas wins business, sets prices, evaluates and trains sales representatives, and services customers. *Id.*

10.      Cintas does not maintain a dedicated healthcare specialist in every region across the country. ECF 38-3 ¶ 20. Cintas's generalist sales representatives identify and acquire healthcare customers in their territories and bring in partners with healthcare expertise to support more complex or technical opportunities. *Id.* As a result, employees outside the dedicated healthcare sales team routinely encounter, service, and sell to healthcare customers. *Id.*

11.     Employees across Cintas's business segments develop knowledge of Cintas's healthcare products, services, pricing, and customer relationships through their regular duties. *Id.* ¶ 21.

12.     Cintas's pricing infrastructure is substantially consistent across business lines within a strategic market. *Id.* ¶ 22. The pricing calculators,[3] pricing models, and contract structures used for healthcare customers share a common framework with those used for other private Cintas customers that are national in scope. *Id.* An employee who has worked with pricing calculators, profit analysis tools, or contract structures in Cintas's industry segments selling to large-scale customers would be familiar with the general methodology and frameworks used in the healthcare strategic market. *Id.*

13.     Cintas's sales training programs are substantially similar across business segments. *Id.* ¶ 23. While employees in strategic sales verticals undertake certain industry-specific training, Cintas's core sales methodology, leadership development, and management training are company-wide programs. *Id.* All management trainees, sales representatives, and service sales representatives go through the same foundational training each year, and Cintas's core selling methodology is taught across business segments. *Id.* An employee who has completed Cintas's Management Trainee program or sales leadership programs carries that knowledge regardless of the business segment to which he or she is assigned. *Id.*

14.     Cintas employees also regularly move between business segments over the course of their careers. *Id.* ¶ 24. Employees who follow these cross-division career paths accumulate

---

[3] A pricing calculator is an internal pricing tool used to generate customer-specific quotes for accounts that buy through a GPO.

knowledge of Cintas's business, and the related proprietary information, across multiple segments. *Id.* ¶ 24.

15. Based on the organizational structure, shared training, common pricing infrastructure, and internal mobility, an employee's formal business assignment at a given point in time does not define the full scope of what that employee knows about Cintas's business and proprietary information, including proprietary information related to the healthcare business. *Id.* ¶ 25.

### III. Cintas Competes with ImageFIRST.

16. The industrial laundry industry is extremely competitive, with many providers across the nation. ECF 1 ¶ 18. ImageFIRST is a major Cintas competitor in the healthcare space and is the fastest growing national provider of these services. *Id.*; ECF 27-13 ¶ 5.

17. ImageFIRST has approximately $700 million in annual revenue and nearly 4,000 employees, almost all of whom are focused on the healthcare space. ECF 35-3 ¶ 28. Cintas's healthcare strategic market, by contrast, generates comparable annual revenue—approximately $700 to $730 million—but operates with a dedicated team of approximately 150 people with logistical and local sales support from Cintas's other business segments. ECF 38-2 ¶ 10.

18. ImageFIRST offers products and services that directly overlap with Cintas's healthcare offerings. *Id.* ¶¶ 12–19. ImageFIRST markets itself as a provider of linen, laundry, and facility services for the healthcare industry. *Id.* ¶ 12; *see also* ECF 38-4 (ImageFIRST brochure describing ImageFIRST as the "leading provider of linen, laundry, and facility services for the healthcare industry" and identifying product categories and healthcare customers that directly overlap with Cintas); ECF 38-5–15 (ImageFIRST webpages confirming that Cintas's and ImageFIRST's product offerings and target customer base overlap).

19.     ImageFIRST further competes with Cintas for several of Cintas's largest national healthcare customers. ECF 38-2 ¶ 18. These are among the top-tier healthcare accounts in Cintas's portfolio and are among the most strategically significant relationships in the healthcare strategic market. *Id.*

20.     The competitive overlap between Cintas and ImageFIRST extends across multiple product categories, customer types, and geographic regions. *Id.* ¶ 19. Both companies sell to acute and non-acute healthcare customers, both compete for GPO contracts, both offer managed linen and textile programs, and both market facility services and infection-prevention products to the same buyer universe. *Id.*

**IV.     Cintas's Trade Secrets and Confidential Information.**

21.     Cintas's healthcare business depends on a body of confidential and proprietary information, including: customer-specific information, pricing and contract frameworks, national account strategy and proposals, operational knowhow and practices, training programs and go-to-market methodologies, and branding and marketing assets. ECF 27-16 ¶ 6.

22.     Customer-specific information includes, but is not limited to, non-public customer contacts, purchasing authority relationships, service configurations, pricing histories, and contract renewal strategies. *Id.* ¶ 7. These relationships take years to develop, and the information is not ascertainable from public sources. *Id.*

23.     Pricing and contract frameworks include, but are not limited to, pricing models, internal margin targets, and negotiation strategies used in connection with GPOs. *Id.* ¶ 8. These frameworks govern nearly all procurement opportunities and provide critical leverage in Cintas's competitive bidding. *Id.*

24. National account strategy and proposals include customer-specific proposals, attachments, and early-stage strategy materials for major national healthcare systems, including internal assessments of customer needs, competitive vulnerabilities, and pricing tolerances. *Id.* ¶ 9.

25. Training programs and go-to-market methodologies include proprietary sales training systems, leadership development programs, KPIs, and operational best practices developed over decades. *Id.* ¶ 10. These materials reflect Cintas's institutional knowledge developed over years through continuous and substantial investment and are not publicly available or easily replicated. *Id.*

26. Branding and marketing assets include high-value marketing materials such as product "lookbooks" and service brochures, reflecting millions of dollars in investment. *Id.* ¶ 11. These materials are used to position Cintas in the nationwide healthcare market. *Id.* The marketing materials that are provided to customers provide broad, high-level overviews of the products and services Cintas offers. ECF 38-3 ¶ 17. These marketing materials do not, however, disclose details on Cintas's pricing and contract frameworks, national account business strategies, training programs and go-to-market methodologies, or even the full scope of products and services Cintas provides, including their product numbers, price points, or related details. *Id.* ¶ 18.

**V.     Cintas's Measures to Protect Confidential Information.**

27. Cintas takes reasonable measures to protect its confidential information and trade secrets. ECF 1 ¶ 57; ECF 27-16 ¶ 12. To maintain the secrecy of this information, Cintas requires employees to sign confidentiality and non-disclosure agreements and restricts access to sensitive materials through password protection, role-based access controls, and internal data-security systems. ECF 1 ¶¶ 57–58; ECF 27-16 ¶ 12.

28. By having policies governing graduated access to sensitive information based on seniority and role, Cintas rewards loyalty and years of service to the company with greater access to trade secrets. ECF 1 ¶ 58; ECF 27-16 ¶ 13. Once employees reach senior leadership or national account roles, they gain access to information that effectively "opens the key to the kingdom." ECF 27-16 ¶ 13.

29. Information relating to national accounts, pricing models, GPO strategy, and proprietary training systems is limited to a narrow group of high-level personnel and cannot be accessed without appropriate permissions. ECF 1 ¶ 57; ECF 27-16 ¶ 14. These individuals are bound by heightened contractual and fiduciary obligations. ECF 1 ¶ 79. Generally, confidential information is siloed, so employees can only access information and materials relevant to their roles. *Id.*; ECF 27-16 ¶ 14.

30. Cintas also prohibits use of personal email or cloud storage for company materials, conducts email monitoring, maintains historical retention systems, and utilizes forensic review and audit capabilities. ECF 1 ¶ 58; ECF 27-16 ¶ 15. Cintas also employs strict requirements for departing employees to return Cintas confidential and proprietary materials. ECF 1 ¶ 58; ECF 27-16 ¶ 15.

**VI.     Departures of Cintas Employees to ImageFIRST.**

31. Beginning in or around 2024, multiple long-tenured employees left Cintas and immediately joined ImageFIRST in senior roles, including vice presidents, sales directors, national account leaders, and regional managers. ECF 27-16 ¶¶ 16–17; ECF 27-13 ¶¶ 4, 6, 8.

32. Many of these employees had access to pricing models, GPO contracting strategies, training systems, and national account proposals. ECF 27-16 ¶ 17; ECF 27-13 ¶ 8.

9

33. In several instances, employees stated they had not accepted employment with a competitor or indicated they were taking personal or medical leave, despite evidence that they were in the process of transitioning to ImageFIRST. ECF 27-13 ¶ 23. Of the former employees whose devices were available for forensic examination, each transmitted or retained Cintas confidential documents before departing and assuming similar roles at ImageFIRST. *See generally* ECF 27-15; ECF 38-1.

34. In all, at least thirteen former employees have left Cintas for ImageFIRST since around 2024. ECF 27-13 ¶ 6. These include, at least, Dave Hilderbrand, Brian Brosnan, Shelby Ray, Nellie Lunetta, Ryan Hartzheim, Mikael Zuidema, Parris Pisionna, Edgar Sandoval, Jamal Pierce, Fadi Beshwati, Tatum Garrity, and Steve Browne. *Id.* ¶ 7; ECF 27-16 ¶ 18.

35. Even after it filed its Complaint, Cintas learned that an additional former employee, Cameron Schmidt, had joined ImageFIRST. ECF 27-13 ¶ 7; ECF 27-15 ¶ 28; ECF 27-14 ¶ 9. ImageFIRST has also approached other current senior members of the healthcare team. ECF 38-2 ¶¶ 20–24.

36. Hilderbrand, Brosnan, Lunetta, Sandoval, and Hartzheim all possess deep knowledge of Cintas's healthcare business, pricing methodologies, customer relationships, operational practices, sales playbooks, and strategic models. ECF 27-13 ¶¶ 8, 18. The institutional knowledge these employees accumulated over their tenures cannot be readily replaced through new hires alone. *Id.*

37. In August 2024, Hilderbrand, a long-tenured Cintas Vice President of Sales and 20-year employee, resigned from Cintas and immediately joined ImageFIRST as its Chief Commercial Officer. *Id.* ¶ 9. Hilderbrand's previous role at Cintas granted him access to confidential pricing, customer, and strategic information relating to national account customers.

10

ECF 38-2 ¶ 27. As Chief Commercial Officer at ImageFIRST, Hilderbrand now sits at the top of ImageFIRST's sales organization and oversees nationwide strategy. ECF 27-13 ¶ 9. At the time of his resignation, Hilderbrand falsely told Cintas that he had saved enough money and intended to "take time off" and that he had no plans to join a competitor, which would include ImageFIRST. *Id.* ¶ 10.

38. In February 2025, Brosnan, a 16-year Cintas veteran and former Service Training Director, joined ImageFIRST as its Vice President of Sales for the Northeast. *Id.* ¶ 11. Shortly before departing Cintas, Brosnan toured a Cintas plant in Portland, Maine that services healthcare customers and requested to leave with samples of Cintas products and marketing materials, which he intended to bring to ImageFIRST. *Id.* ¶ 12. During this tour, which was outside of his normal duties as a training director, Brosnan gained first-hand knowledge of Cintas's proprietary plant layout, operations, and approach to servicing InterMed. *Id.* ¶ 13. The evidence supports the inference that Brosnan undertook the plant tour to benefit ImageFIRST in anticipation of his upcoming employment there, including because ImageFIRST and Cintas have competed for InterMed's business since Brosnan's departure to ImageFIRST. *Id.* ¶ 14. ImageFIRST paid Brosnan a signing bonus of at least $1 million. *Id.* ¶ 15.

39. In October 2025, Lunetta, a Major Account Manager for Healthcare named Cintas's Healthcare Major Account Manager of the Year, resigned and joined ImageFIRST. *Id.* ¶ 16. Prior to her departure, Lunetta was on the front lines of Cintas's rapidly growing non-acute healthcare business. *Id.* ¶ 16. ImageFIRST hired Lunetta specifically to develop its newly appointed healthcare national account and GPO business strategy. *Id.* Lunetta falsely stated to Cintas after submitting her notice of resignation that she did not have another job lined up, but she interviewed and received a job offer from ImageFIRST—a job offer that was sent directly to her Cintas email—

prior to submitting her notice of resignation. *Id.* ¶ 17. She also submitted paperwork to take medical leave one day after interviewing with ImageFIRST. *Id.* The timing of this request frustrated efforts by Cintas to learn about her new employment and thus take reasonable measures to protect its trade secrets and confidential information. *Id.* In fact, Lunetta accessed and retrieved proprietary customer data, pricing models, and customer intelligence from Cintas's systems in the months leading up to her departure, without authorization to retain those materials. *Id.*; ECF 27-15 ¶¶ 8–9.

40.     In November 2024, Hartzheim, formerly a Global Account Manager at Cintas, joined ImageFIRST as Regional Vice President of Sales for the West Coast. ECF 27-13 ¶ 20. As a Global Account Manager, Hartzheim had access to Cintas's largest national relationships and strategic pricing models. *Id.* Hartzheim, now ImageFIRST's Regional Vice President of Sales for the West Coast, has directly recruited current Cintas employees to join ImageFIRST. *Id.* ¶ 21. Hartzheim received a $100,000 increase in his base salary to move to ImageFIRST. *Id.* ¶ 22.

41.     ImageFIRST knew that current and departing Cintas employees were bound by confidentiality agreements and duties of loyalty. ECF 27-16 ¶ 20. ImageFIRST nevertheless offered compensation packages that included substantial signing bonuses and commitments to pay attorneys' fees if Cintas sued employees who accepted roles closely paralleling their positions at Cintas. *Id.*

42.     ImageFIRST benefited from the retention and use of Cintas confidential materials and failed to implement safeguards to prevent misuse of Cintas information. *Id.* ¶ 23. These employees are currently in roles where use of Cintas's confidential information and trade secrets is inevitable. *See generally* ECF 27-2 ¶¶ 4–13.

43.     Cintas's initial investigations have revealed that these former employees accessed, downloaded, and forwarded confidential company materials to personal email accounts prior to their departures. The following evidence is based on forensic examination of laptops and digital activity of former Cintas employees who departed to join ImageFIRST. ECF 38-2 ¶ 25; *see generally* ECF 27-15; ECF 38-1.

   a.     Hilderbrand, Cintas's former Vice President of Sales, sent customer presentations, product offerings, and other confidential files to his personal email approximately two months before resigning. ECF 1 ¶ 25; ECF 38-2 ¶¶ 26–28. Among the documents Hilderbrand emailed to himself before his departure was a comprehensive marketing presentation titled "Building a Better Workday." ECF 38-2 ¶ 28. This document is an enterprise-level compilation of Cintas's workwear and facility services offerings, covering product categories including uniforms, flame resistant clothing, rental workwear, culinary apparel, garment care and inspection processes, facility services such as floor care, restroom supplies, and kitchen services, as well as Cintas's sustainability initiatives and customer references. *Id.*; *see also* ECF 38-16. While portions of this presentation may be shared selectively with individual customers, Cintas does not make the complete compilation publicly available. ECF 38-2 ¶ 28.

   b.     Lunetta accessed Cintas's password-protected systems on her final day of employment and retrieved contract documents, transaction data, cost analyses or pricing calculators, employee lists, and sales proposals that include confidential information on Cintas's healthcare pricing and customers. ECF 27-15 ¶¶ 8–13; ECF 38-2 ¶ 29. Three of the documents Lunetta accessed relate to one multi-location,

non-acute GPO customer and include: (1) a cost analysis and pricing calculator used to generate a sales proposal for the customer, (2) two years of transaction data for the customer listing all the products and services it purchased, including the quantity and pricing of those items and information on the customer's locations, and (3) the customer's sales contract listing the customer's individual locations, products and services, and pricing. ECF 38-2 ¶ 30. The documents Lunetta accessed also include three additional customer-specific proposal documents for healthcare customers listing different pricing for Cintas products and services. *Id.*; *see also* ECF 38-17–22 (examples of documents Lunetta accessed on her final day of employment). A competitor with access to this information would gain insight into Cintas's pricing strategy and could undercut Cintas in competitive bids for these specific customers—as well as other similarly situated healthcare customers— without the years of investment Cintas made to develop its healthcare pricing models. ECF 38-2 ¶ 31.

c.   Sandoval, a 23-year Cintas veteran, sent confidential documents to his personal email about four weeks before he began working at ImageFIRST. ECF 27-15 ¶ 24; ECF 38-2 ¶ 34. The documents included a sales recruiting messaging memorandum, sales scripts, a GPO recruiting presentation, sales forecasting tools, Cintas's compensation structure for sales representatives with detailed bonus criteria, and details regarding Cintas's proprietary training program. ECF 27-15 ¶ 24. Among the documents Sandoval emailed to himself were two spreadsheets: a "Sales Partner Forecast Tool" and a "Loc 698 Q3 FY 25 WE Manager Forecast Tool." *Id.*

d.      Garrity sent a "brag book" to a personal email about four weeks before she began working at ImageFIRST. *Id.* ¶ 17; ECF 38-2 ¶ 32. The brag book is a compilation of Garrity's sales accomplishments at Cintas, and includes the names of Cintas non-acute healthcare customers, key contacts at healthcare GPOs, and leading Cintas sales representatives for non-acute healthcare customers. Information on Cintas's key non-acute healthcare customers and top performers in this space is not shared publicly. ECF 27-15 ¶ 17; ECF 38-2 ¶ 33.

e.      Brosnan plugged a USB device into his Cintas computer several times immediately prior to his departure and appears to have loaded hundreds of non-public, proprietary Cintas documents and materials. ECF 38-1 ¶¶ 6, 14–20.

44.      These are a few examples of what Cintas's preliminary investigations have revealed to date.

**VII.    Harm to Cintas.**

45.      As a result of ImageFIRST's conduct, Cintas has suffered and continues to suffer erosion of competitive advantage, exposure of proprietary information, impairment of customer relationships, loss of key leadership personnel, and significant business disruption within a high-stakes market segment. ECF 27-16 ¶ 22.

46.      The evidence suggests that ImageFIRST has used, and continues to use, Cintas's proprietary information to compete against Cintas—including by undercutting Cintas's pricing, targeting Cintas's high-value customers and customer contacts, replicating proprietary training models, and recruiting Cintas's sales representatives. *Id.* ¶ 23.

<u>**CONCLUSIONS OF LAW**</u>

**I.      Legal Standard.**

47.      A party seeking a preliminary injunction must establish (i) a reasonable probability of success on the merits, and (ii) that it will suffer irreparable harm absent injunctive relief. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017); *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974). If the first two factors are satisfied, the court has discretion to balance those factors with (iii) the possibility of harm to other interested persons from the grant or denial of the injunction and (iv) the public interest, to determine if equitable relief is appropriate. *See, e.g.*, *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975); *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982) (same); *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990); *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) (similar).

48.      Where trade secret misappropriation or threatened disclosure is shown, courts in this Circuit routinely find irreparable harm and grant preliminary injunctive relief. *See, e.g.*, *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1265 (3d Cir. 1985) ("extensive precedent supports an injunctive remedy where the elements of a trade secret claim are established" and injunctive relief is necessary to protect the holder of the trade secret); *see also Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 119 (3d Cir. 2010) (upholding the issuance of a preliminary injunction); *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 280 (3d Cir. 2019) (same); *Cerro Fabricated Prods., LLC v. Solanick*, 300 F. Supp. 3d 632, 658 (M.D. Pa. 2018) (finding it "more likely than not" that irreparable harm would be suffered in absence of preliminary injunction).

49.      Finally, in preliminary injunction hearings, courts may consider "affidavits and other hearsay materials, to the extent appropriate," as courts are not "strictly bound by the Federal Rules of Evidence" in such hearings. *Trs. of Gen. Assembly of Lord Jesus Christ of Apostolic Faith,*

*Inc. v. Patterson*, 527 F. Supp. 3d 722, 768 (E.D. Pa. 2021), *aff'd sub nom. Trs. of Gen. Assembly of Church of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, 2021 WL 6101254 (3d Cir. Dec. 21, 2021); *see also Mazzoni Ctr. v. LCF Grp., Inc.*, 2024 WL 4821475, at *6 (E.D. Pa. Nov. 18, 2024) (same). "It is well established that a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004).

**II.    Cintas Is Likely to Succeed on the Merits.**

50.    As explained below, the Court finds Cintas is likely to prevail on its claims for trade secret misappropriation and tortious interference with contract.[4]

**A.    Trade Secrets Misappropriation.**

51.    Cintas is likely to prevail on its claims for trade secret misappropriation under both the DTSA and the PUTSA. The DTSA provides a cause of action to "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To establish misappropriation under either statute, a plaintiff must show: (1) it possesses protectable trade secrets; (2) the defendant acquired, used, or disclosed those trade secrets; and (3) the defendant knew or had reason to know that the trade secrets were acquired by improper means. *See* 18 U.S.C. § 1839(5); 12 Pa. C.S.A. § 5302.

1.    <u>Cintas Has Identified Protectable Trade Secrets.</u>

52.    To establish a protectable trade secret under the DTSA, a plaintiff must show "(a) the owner has taken reasonable means to keep secret; (b) derives independent economic value,

---

[4] Accordingly, the Court need not address Cintas's likelihood of success on the merits of its other claims.

actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and

(d) others who cannot readily access it would obtain economic value from its disclosure or use."

*Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 519 (E.D. Pa. 2018) (quoting *Teva Pharm.*

*USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018)). Similarly, under the PUTSA, a

trade secret is "information" that:

> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. Ann. § 5302; *see Bimbo Bakeries*, 613 F.3d at 109. The key factors under

Pennsylvania law are "substantial secrecy and competitive value to the owner." *Emergency Care*

*Rsch. Inst. v. Guidant Corp.*, 2007 WL 2702455, at *4 (E.D. Pa. Sept. 12, 2007) (quoting *O.D.*

*Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1070 (Pa. Super. Ct. 2003)).

53.     Courts look to the following factors when assessing an alleged trade secret: "(1) the

extent to which the information is known outside of the company's business; (2) the extent to

which the information is known by employees and others involved in the company's business;

(3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the

value of the information to the company and its competitors; (5) the amount of effort or money the

company spent in developing the information; and (6) the ease or difficulty with which the

information could be acquired or duplicated legitimately by others." *Bimbo Bakeries*, 613 F.3d at

109 (quoting *Crum v. Bridgestone/Firestone N. Am. Tire, LLC*, 907 A.2d 578, 585 (Pa. Super. Ct.

2006)).

54.     Cintas has submitted evidence showing protectable trade secrets developed through

decades of substantial investment. These trade secrets include non-public pricing methodologies,

competitive bid strategies, GPO contracting structures and pricing, customer-specific requirements

and pricing information, national and global account structures, sales processes and playbooks, proprietary training programs, internal presentations, market analyses, employee performance criteria, and operational models. ECF 27-16 ¶¶ 6–11.

55. Pricing information and business plans are sensitive trade secrets. *Freedom Med.,* 343 F. Supp. 3d at 522 (finding regional business plans and pricing information to be trade secrets); *BIEC Int'l, Inc. v. Glob. Steel Servs., Ltd.*, 791 F. Supp. 489, 545 (E.D. Pa. 1992) (noting "certain business and marketing information including the costing and pricing information of an employer's product or services, an employer's business plans, marketing strategies, and financial projections and the terms of specific customer accounts including contract expiration dates and revenues generated" may be trade secrets). This information derives independent economic value from not being generally known to competitors such as ImageFIRST or readily ascertainable. ECF 1 ¶¶ 62, 77. Access to these trade secrets provides a competitor with a significant advantage in pricing, customer acquisition, operational execution, employee recruitment, and market expansion.

56. Cintas takes extensive measures to maintain the secrecy of this information. All employees must execute confidentiality agreements, and senior sales and national-account personnel are subject to heightened obligations. ECF 27-16 ¶ 12. Cintas maintains written confidentiality policies, role-based access control protocols, and security procedures that restrict access to sensitive materials to individuals with legitimate business needs. *Id.* ¶¶ 12–14. Confidential information is siloed so employees access only materials relevant to their roles, and as employees advance to senior positions, their access rights expand in a graduated fashion. *Id.* ¶ 13. Senior executives and national account personnel gain access only because of their trusted roles, and they are subject to heightened obligations. *Id.* ¶¶ 13–14. Cintas also protects its information through digital controls, email monitoring, historical retention systems, and forensic-

review capabilities. *Id.* ¶ 15. These measures satisfy Cintas's obligation to take reasonable steps to maintain secrecy. *See SI Handling*, 753 F.2d at 1250 (noting that the lower court found limiting disclosure of information by having employees sign confidentiality agreements, among other procedures, was sufficient to show SI Handling Systems used reasonable measures to protect its confidential information); *BIEC Int'l,* 791 F. Supp. at 513 (finding BIEC's use of confidentiality agreements and access control protocols, among other protocols, sufficient to show BIEC used reasonable measures to protect its confidential information).

57.     That some component parts of Cintas's information may be publicly available does not preclude finding trade secrets. Courts recognize that the unique combination and compilations of customer, pricing, and strategic information developed through substantial investment may be protectable even if some underlying data points are publicly available. *See Arnold's Off. Furniture, LLC v. Borden*, 2022 WL 523602, at *4 (E.D. Pa. Feb. 22, 2022) (holding that a plaintiff's significant investment of time and capital makes customer and pricing lists protectable trade secrets even where some contact information may be available from third-party sources); *see also BIEC Int'l*, 791 F. Supp. at 545 (granting trade secret protection to customer list containing information readily ascertainable to industry workers). Here, Cintas alleges proprietary pricing strategies, customer tiers, GPO contractual tools, RFP playbooks, product "lookbooks," recruiting materials, and sales-performance frameworks developed over time and not generally known to competitors. ECF 27-16 ¶¶ 6–11.

### 2.     Cintas Has Plausibly Pleaded Acquisition, Use, and Threatened Use.

58.     The record demonstrates both actual and threatened misappropriation. Based on the foregoing findings, the Court concludes that Cintas has demonstrated a likelihood of success in establishing that ImageFIRST acquired Cintas's trade secrets through its pattern of recruiting and

hiring employees with access to highly confidential information, and those employees surreptitiously transferring that information to themselves shortly before departing Cintas. Beginning in 2024 and continuing through the present, ImageFIRST recruited at least thirteen key Cintas employees, including vice presidents, sales directors, regional leaders, and major account managers responsible for some of Cintas's largest and most important healthcare relationships. ECF 27-13 ¶ 6; ECF 27-16 ¶ 16. The preliminary evidence demonstrates that ImageFIRST knew these employees were bound by confidentiality obligations and restrictive covenants and that their unauthorized acquisition or use of Cintas's proprietary information would constitute misappropriation. ECF 27-16 ¶ 19. ImageFIRST knowingly hired these individuals into roles just like their positions at Cintas. *Id.* ¶ 20. These roles necessarily involve pricing, national account strategy, training, and competitive positioning. Courts in this District consistently hold that, where an employee with deep knowledge of trade secrets assumes a comparable role for a competitor, threatened misappropriation warrants injunctive relief. *See Bimbo Bakeries*, 613 F.3d at 114; *Ilapak v. Young*, 2020 WL 2787689 (E.D. Pa. May 29, 2020).

59. The record also reveals specific instances of trade secret misappropriation in which former employees acquired or retained Cintas's confidential materials through improper means. Hilderbrand sent confidential Cintas documents—including customer presentations and product offerings—to his personal email account just before resigning. ECF 38-2 ¶¶ 26–28. Lunetta accessed Cintas's password-protected systems on her last day of employment and retrieved numerous confidential documents, including book pricing and pricing calculators for GPO accounts, profitability analyses and current customer pricing for GPO accounts, and contract language related to Cintas's GPO agreements. ECF 27-15 ¶¶ 8–13; ECF 38-2 ¶¶ 29–30. Throughout October 2025, including the day of his resignation, Sandoval forwarded to his personal

email confidential documents, including a sales recruiting messaging memorandum, sales scripts, a GPO recruiting presentation, sales forecasting tools, and Cintas's compensation structure for sales representatives with detailed bonus criteria. ECF 27-15 ¶ 24. Garrity sent to her personal email information about Cintas customers, as well as Cintas's confidential criteria for evaluating sales reps and lists of Cintas's top sales performers. *Id.* ¶ 17; ECF 38-2 ¶¶ 32–33.

60. The Court finds ImageFIRST's argument that Cintas cannot show misappropriation because it lacks proof of actual use unpersuasive. Both the DTSA and PUTSA authorize injunctive relief for threatened misappropriation. Moreover, Cintas need not prove ImageFIRST has already deployed its trade secrets; it need only show a likelihood that the information will be used. That showing is met here, as the record establishes:

- **Access**: employees with high-level access to pricing, customer, and strategy information;

- **Acquisition**: forensic evidence of downloads, forwarding, and external transfers immediately before departure; and

- **Overlap**: placement of those same employees into roles at ImageFIRST involving pricing, sales strategy, and customer targeting.

61. That combination independently supports an inference of use—that Cintas's information, now in ImageFIRST's possession, will inform decision-making and provide an unfair competitive advantage absent Court intervention. *See* ECF 27-1 at 5–6, 10–12, 16–21; ECF 27-16 ¶¶ 16–21, 23–25; ECF 27-13 ¶¶ 9, 11, 21–23. Courts routinely find threatened use where employees take confidential materials, such as the documents at issue here, and assume comparable roles with a competitor even without proof of "actual" deployment. *See Bimbo Bakeries*, 613 F.3d at 114; *Ilapak*, 2020 WL 2787689 (E.D. Pa. May 29, 2020); *see also* ECF 27-

1 at 7–12, 15–18. Moreover, ImageFIRST's offer to pay legal expenses to the departing employees further supports an inference of threatened misappropriation. *See* ECF 27-1 at 7–12, 15–18.

62. The inevitable-disclosure doctrine forms another independent basis to find threatened use. The Court finds ImageFIRST's arguments regarding the inapplicability of this doctrine unpersuasive. The DTSA and PUTSA statutes expressly authorize use of this doctrine as evidence of threatened misappropriation. *See* 18 U.S.C. § 1836(b)(3)(A)(i); 12 Pa. Cons. Stat. § 5303(a). Pennsylvania law permits an injunction where the record shows a "sufficient likelihood" or "substantial threat" that trade secrets will be disclosed or used in the new employment. *Bimbo Bakeries*, 613 F.3d at 113–14; *Air Prods. & Chems., Inc. v. Johnson*, 442 A.2d 1114, 1120–25 (Pa. Super. 1982). ImageFIRST hired numerous Cintas employees with access to Cintas's confidential information into overlapping roles where ImageFIRST stands to obtain the benefit of that information, and several of those employees secretly took that information with them as they left. That is threatened misappropriation sufficient to support injunctive relief.

### 3. Cintas and ImageFIRST Compete in the Healthcare Market.

63. Neither the DTSA nor PUTSA requires Cintas to prove that ImageFIRST is a head-to-head competitor. The statutory question is whether the record shows a likelihood or substantial threat of disclosure; it does not require one hundred percent competitive overlap. *See Bimbo Bakeries*, 613 F.3d at 113–14; *Air Prods.*, 442 A.2d at 1120, 1124–25.

64. Regardless, the direct competition between Cintas and ImageFIRST is clear. ECF 38-2 ¶ 9. The companies sell overlapping products and services—including scrubs, lab coats, dispensing technology, privacy curtains, microfiber solutions, floor mats, hygiene products, and linen/laundry/facility services—to the same healthcare customer base, including hospitals, health systems, surgery centers, outpatient facilities, and other acute and non-acute providers. *Id.* ¶¶ 10–11, 15. Cintas thus competes directly with ImageFIRST in real-world customer opportunities,

competitive bids, and renewals, and Cintas's team has documented hundreds of competitive scenarios involving ImageFIRST over the last two years. *Id.* ¶ 12.

65.     The Hilderbrand arbitration does not establish otherwise. That decision addressed only Hilderbrand's individual role and a limited record, and expressly turned on facts unique to him. It says nothing about the broader pattern here, which involves multiple employees with direct healthcare responsibilities and documented access to confidential materials and information immediately before departure. While Cintas is a diversified enterprise, its healthcare segment is strategically important and national in scope, and ImageFIRST is the fastest-growing national provider in that space. *See* ECF 27-1 at 2–6; ECF 27-13 ¶ 5. The recruitment at issue targeted Cintas's healthcare-facing personnel, and the documents removed include healthcare-specific materials that directly affect competition in the segment where the parties do overlap. *See* ECF 27-1 at 5–6, 9–12; ECF 27-15 ¶¶ 8–13. Thus, any arbitration finding of "scant" competitive overlap—by which the Court is not bound in any event—was limited to Hilderbrand's individual situation and the narrow arbitration record, not the broader competitive reality between Cintas and ImageFIRST. *See, e.g.*, *Gallagher v. Ohio Cas. Ins. Co.*, 2014 WL 1386990, at *6 (E.D. Pa. Apr. 9, 2014) (explaining that the Third Circuit "admonishes against application of collateral estoppel to arbitral awards absent extreme care") (citing *Witkowski v. Welch*, 173 F.3d 192, 206 (3d Cir. 1999)).

### B.     Tortious Interference with Contract.

66.     A plaintiff must establish: "(1) the existence of a contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation . . .; (3) the absence of a privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." *Synthes (USA) v. Globus Med., Inc.*, 2007 WL 2043184, at *8 (E.D. Pa. July 12, 2007).

67. ImageFIRST's actions interfere with Cintas's contractual relationships with its employees by misappropriating confidential information and using it to compete against Cintas. *See generally Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa. 1978); *M3 USA Corp. v. Hart*, 516 F. Supp. 3d 476, 504 (E.D. Pa. 2021) (claim stated where former employee used confidential information to divert business opportunities); *Liberty Mut. Ins. Co. v. Gemma*, 301 F. Supp. 3d 523, 544 (W.D. Pa. 2018) (plaintiff stated a claim for tortious interference where an employee violated restrictive covenants and forwarded client data to himself).

68. Cintas had valid and enforceable employment agreements with the departing employees, which contained restrictive covenants including non-competition, non-solicitation of customers, non-solicitation of employees, and confidentiality provisions. ECF 1 ¶¶ 94–96, 98; ECF 27-16 ¶ 19. ImageFIRST had knowledge of these contractual obligations since at least Hilderbrand's hiring in August 2024. ECF 27-16 ¶ 19. ImageFIRST's promise to cover attorneys' fees for the departing employees further confirms that ImageFIRST knew of these employees' contractual obligations. *Id.* ¶ 20. Despite this knowledge, ImageFIRST intentionally and improperly procured breaches of these agreements. It encouraged departing employees to conceal their planned employment while still at Cintas and hired departing employees into roles substantially like their former positions where the use of Cintas's confidential information was inevitable. ECF 27-13 ¶ 23. Multiple employees misled Cintas during their resignations by denying they were joining a competitor, lying about receiving job offers, or taking personal or medical leave under false pretenses, all while communications show they had already accepted offers or were in active employment discussions with ImageFIRST. *Id.*

69. ImageFIRST also intentionally induced breaches by offering compensation substantially above market rates to the departing employees. ECF 27-16 ¶ 19; ECF 27-13 ¶¶ 15,

22. Such conduct, taken as a whole, constitutes improper interference and active participation in disloyal conduct under Pennsylvania and other relevant state law, providing an independent basis for injunctive relief. *See generally Adler*, 393 A.2d at 1183; *M3 USA*, 516 F. Supp. 3d at 504; *Liberty Mut.*, 301 F. Supp. 3d at 544.

70. The competitor's privilege does not immunize the use of wrongful means. It protects competition for at-will employees only where the defendant does not induce breach or engage in other independently wrongful conduct, such as using supracompetitive inducements, coaching concealment and misrepresentation of planned future employment, or accepting misappropriated materials. *Vertex, Inc. v. Avalara, Inc.*, 2024 WL 1484608, at *3 (E.D. Pa. Apr. 5, 2024), *reconsideration denied*, 2024 WL 5671130 (E.D. Pa. 2024) (denying a motion to dismiss a tortious interference claim because plaintiff "clearly alleges that Defendant engaged in wrongful behavior and misconduct in the process of attempting to recruit or poach [ ] employees which is sufficient to overcome the competitor's privilege defense"). The privilege is not applicable here, where the evidence suggests ImageFIRST recruited Cintas employees it knew to be subject to restrictive covenants, offered substantial compensation packages, and agreed to cover potential legal costs. Nor does the competitor's privilege shield interference with valid non-solicitation and confidentiality covenants, such as those at issue here. *DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp. 3d 225, 245 (E.D. Pa. 2017); *Acclaim Sys., Inc. v. Infosys, Ltd.*, 2015 WL 4257463, at *4 (E.D. Pa. July 14, 2015).

**III.  Cintas Will Suffer Irreparable Harm Absent Injunctive Relief.**

71. Irreparable harm exists where the injury cannot be adequately compensated by monetary damages or the harm is ongoing and difficult to quantify. *Verizon Commc'ns Inc. v. Pizzirani*, 462 F. Supp. 2d 648, 658 (E.D. Pa. 2006) (citing *FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984) (holding "the loss of a trade secret is not measurable in

terms of money damages")); *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 554 (3d Cir. 2003). In trade secret cases, courts routinely find irreparable harm where the misappropriation threatens the plaintiff's competitive position and the loss of trade secret protection cannot be undone. *See generally Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 913 (3d Cir. 2021) (finding that a "trade secret's economic value depreciates or is eliminated altogether upon its loss of secrecy when a competitor obtains and uses that information without the owner's consent").

### A. Loss of Trade Secret Protection Constitutes *Per Se* Irreparable Harm.

72. The misappropriation of trade secrets, by its very nature, causes irreparable harm. Once trade secrets are disclosed or used by a competitor, the confidentiality that gave them value is destroyed and cannot be restored. Courts recognize that such harm is irreparable. *See Bimbo Bakeries USA, Inc. v. Botticella*, 2010 WL 571774, at *13 (E.D. Pa. Feb. 9, 2010). The disclosure of trade secrets cannot be adequately remedied by damages because there is no way to "unring the bell." *See Oakwood*, 999 F.3d at 914 (citing *FMC Corp.*, 730 F.2d at 63 n.20 ("A trade secret once lost is, of course, lost forever.")).

73. The preliminary evidence shows ImageFIRST has already acquired Cintas's trade secrets through the coordinated recruitment of key employees. Once in ImageFIRST's possession, this information cannot be "unlearned" or compartmentalized. This harm is ongoing and compounding. Multiple departing employees have already transmitted confidential Cintas materials to personal accounts or to ImageFIRST. Each of these employees' acts represents an irreversible disclosure that continues to harm Cintas each day that it remains unremedied.

### B. Cintas Faces Ongoing Loss of Competitive Position and Customers.

74. Beyond the loss of trade secret protection itself, Cintas faces ongoing and escalating harm to its competitive position, customer relationships, and market standing. The healthcare

market is one of Cintas's most important business segments, representing a significant portion of its annual revenue. ECF 1 ¶¶ 16–17; ECF 27-16 ¶ 5; ECF 38-3 ¶ 5; ECF 38-2 ¶ 5. ImageFIRST is the fastest-growing national provider in this market, making the protection of confidential, proprietary information critically important.

75. ImageFIRST has used, and continues to use, Cintas's trade secrets for its commercial advantage. For example, ImageFIRST has sought to undercut Cintas's confidential pricing, target Cintas's internally recognized highest-value customers, replicate Cintas's proprietary training models, respond strategically to Cintas's proposals, bids, and renewals, improve ImageFIRST's internal processes using Cintas's work product and industry know-how, and recruit Cintas's top performing sales representatives. ECF 27-16 ¶ 23. Each competitive bid lost or customer relationship eroded represents harm that cannot be adequately measured or compensated through monetary damages.

76. The harm extends beyond Pennsylvania and affects Cintas's competitive position in the national healthcare market. ImageFIRST has placed former Cintas employees into senior roles across multiple states. ECF 27-13 ¶¶ 9, 11, 21; ECF 27-2 ¶ 6. Each of these individuals possesses deep knowledge of Cintas's healthcare business, pricing methodologies, customer relationships, operational practices, sales playbooks, and strategic models. Their knowledge cannot be erased, and their positions at ImageFIRST ensure that Cintas's confidential information will continue to inform ImageFIRST's competitive strategy absent injunctive intervention.

### C. The Harm to Cintas Is Difficult to Quantify and Impossible to Remedy Fully.

77. Finally, irreparable harm exists where the nature of the injury makes calculation of damages impracticable or speculative. *Par Pharm.*, 764 F. App'x at 280 (finding district court's evidence sufficient including the statement that due to difficulties in calculation, money damages

may be inadequate); *Neo Gen*, 69 F. App'x at 554 (affirming that "the disclosure of trade secrets would result in irreparable harm . . . that would not be remedied by monetary damages").

78. Here, the harm to Cintas is not adequately compensable through monetary damages. Cintas cannot precisely calculate the full value of lost customer relationships that took years to develop. It cannot quantify the competitive disadvantage of having its pricing strategies, GPO contracting structures, and customer-specific information in the hands of its primary competitor. It cannot measure the long-term erosion of goodwill that results from ImageFIRST's ability to underbid Cintas using Cintas's own proprietary cost structures and pricing models. The misappropriated trade secrets are embedded in Cintas's business operations, and the risk of future misuse is ongoing. Monetary damages alone cannot make Cintas whole.

79. Moreover, the harm to Cintas's workforce stability is itself difficult to quantify. The coordinated departures have deprived Cintas of key leadership personnel, including those responsible for some of Cintas's largest and most strategically important healthcare relationships. *See* ECF 38-2 ¶ 8. Many of these employees had more than a decade of tenure at Cintas. The institutional knowledge and customer relationships they developed cannot be replaced overnight, and the cost of their loss extends far beyond their salaries and the expense of recruiting replacements.

### D. The Risk of Future Misappropriation Is Ongoing and Imminent.

80. Absent injunctive relief, the risk of continued and expanded misappropriation is substantial. ImageFIRST has demonstrated a pattern of escalating recruitment of Cintas employees, beginning with Hilderbrand in August 2024 and continuing into the present. ECF 27-16 ¶ 16; ECF 38-2 ¶¶ 20–24. The conduct involved at least thirteen employees and has continued through the present. ECF 27-13 ¶ 7; ECF 27-15 ¶ 28; ECF 27-14 ¶ 9; ECF 38-2 ¶¶ 20–24.

ImageFIRST's promise to cover departing employees' attorneys' fees suggests that ImageFIRST anticipated legal challenge and factored that cost into its hiring strategy. ECF 27-16 ¶ 20.

81. The departing employees now at ImageFIRST continue to possess knowledge of Cintas's trade secrets. The inevitable disclosure doctrine recognizes that former employees hired by competitors into substantially similar positions will inevitably draw upon the confidential knowledge they acquired from their former employer. *Bimbo Bakeries*, 613 F.3d at 110–12 (explaining that Pennsylvania law allows injunctions for threatened misappropriation based on likely disclosure); *Air Prods.*, 442 A.2d at 1120. Here, ImageFIRST has hired departing employees into nearly identical roles, where the use of Cintas's confidential information and customer relationships is inevitable.

82. The Court is not persuaded by ImageFIRST's contention that Cintas's irreparable harm is negated by the timeline of this litigation. The record shows a pattern of departures spanning 2024 through 2026, including continued developments after the Complaint was filed, which underscores the ongoing and compounding nature of the harm. *See* ECF 27-16 ¶¶ 16–18; ECF 27-13 ¶¶ 6–8; ECF 38-2 ¶¶ 20–24. Cintas proceeded diligently by investigating, employing its forensic capabilities, and initiating employee-specific arbitrations where appropriate while assembling a record adequate to present ImageFIRST's conduct that threatens ongoing use of its healthcare trade secrets to this Court. *See generally* ECF 27-15; ECF 38-1. A brief investigatory period in a complex, multi-jurisdictional matter does not erase the imminent and ongoing threat that these former personnel in comparable roles will use or disclose pricing and strategy knowledge from Cintas in a way money damages cannot remedy. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 726–27 (3d Cir. 2004) (reversing denial of preliminary injunction despite plaintiff's 13-month delay between learning of infringement and filing suit); *BP Chems. Ltd. v. Formosa Chem. & Fibre*

*Corp.*, 229 F.3d 254, 264 (3d Cir. 2000) (affirming preliminary injunction where delay was caused by plaintiff's conscientious decision to fully investigate before filing suit); *see also* ECF 27-1 at 15–19; ECF 27-16 ¶¶ 22–25.

83.     For all these reasons, Cintas will suffer irreparable harm absent preliminary injunctive relief. The Court therefore finds that this factor weighs decisively in favor of granting Cintas's motion for preliminary injunctive relief.

### IV.     The Balance of Equities Favors Injunctive Relief.

84.     To assess the equities, the Court must balance the potential harm to the movant if relief is denied against the potential harm to the opposing party if relief is granted. Where, as here, the movant has demonstrated a likelihood of success on the merits and irreparable harm, the balance of equities tips decidedly in its favor. *See, e.g.*, *Bimbo Bakeries*, 613 F.3d at 119 (finding the "public interest in preventing the misappropriation of [] trade secrets outweighs the temporary restriction on . . . employment"); *Par Pharm.*, 764 F. App'x at 280 (upholding finding that the interest in protecting trade secrets outweighed any harm from the injunction).

85.     Cintas has suffered, and absent injunctive relief will continue to suffer, substantial and irreparable harm to its competitive position, trade secret protections, customer relationships, and workforce stability. Healthcare is one of Cintas's most rapidly expanding and strategically important business segments, representing a significant share of its annual revenue. As ImageFIRST is the fastest-growing national provider in this space, protecting Cintas's confidential information and retaining experienced personnel is critical. The coordinated departures of at least thirteen key employees, many with more than a decade of tenure at Cintas, have deprived Cintas of critical leadership, institutional knowledge, and customer relationships that cannot be easily replaced. *See* ECF 27-13 ¶ 8. Moreover, the evidence demonstrates ImageFIRST has already acquired and is likely using or will imminently use Cintas's trade secrets. Absent injunctive relief,

the risk of continued harm to Cintas's competitive position is ongoing, as the former employees remain in comparable roles with access to information derived from Cintas.

86.     In contrast, any burden imposed on ImageFIRST by injunctive relief is limited in scope and attributable to ImageFIRST's own conduct. The requested relief would require ImageFIRST to compete fairly and lawfully, without the benefit of Cintas's misappropriated trade secrets and confidential information. ImageFIRST would not be prohibited from competing in the healthcare market; it would merely be required to do so based on its own resources, innovation, and relationships rather than those it has wrongfully obtained from Cintas. A party has no legitimate interest in continuing to misappropriate trade secrets, interfere with contracts, or engage in unfair competition. *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063 (Pa. Super. Ct. 2003) (affirming lower court order granting permanent injunction when information was obtained through improper means). A preliminary injunction would maintain the status quo during the pendency of litigation.

87.     To the extent ImageFIRST would suffer any hardship from injunctive relief, that hardship is entirely self-inflicted. *See Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998) ("[t]he self-inflicted nature of any harm suffered [ ] also weighs in favor of granting preliminary injunctive relief"). As set forth in *supra* Findings of Fact § VI, the record shows that ImageFIRST recruited Cintas employees it knew to be subject to restrictive covenants, offered substantial compensation packages, and agreed to cover potential legal costs. Having engaged in this course of conduct, ImageFIRST cannot claim that it will be harmed by being required to cease its illegal activities. *Forbes v. Jingjingwang*, 2025 WL 3691079, at *2 (W.D. Pa. Dec. 19, 2025) (noting "that an infringing party acts at its own peril and issuing a preliminary injunction is simply requiring the infringing party to cease doing what it had no right to do

initially"); *FMC Corp. v. Control Sols., Inc.*, 369 F. Supp. 2d 539, 577 (E.D. Pa. 2005) (agreeing "that any harm that [defendant] suffers from the issuance of a preliminary injunction is the result of [defendant's] own behavior").

**V.      The Public Interest Supports Injunctive Relief.**

88.      There is a strong public interest in protecting trade secrets and enforcing contractual obligations. *See Bimbo Bakeries*, 613 F.3d at 119; *Allied Orthopedic Assocs., Inc. v. Leonetti*, 2018 WL 4051801, at *12 (E.D. Pa. Aug. 24, 2018); *SI Handling*, 753 F.2d at 1265. Trade secret protections encourage innovation and investment by ensuring businesses can reap the rewards of their proprietary information without fear of misappropriation. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974); *Wexler v. Greenberg*, 399 Pa. 569, 578–79 (1960). Contract law promotes stability and predictability in commercial relationships by ensuring parties honor their agreements. Granting injunctive relief vindicates the public interest in the protection of trade secrets and the enforcement of confidentiality agreements.

89.      By contrast, denying relief in these circumstances could diminish the protections afforded to trade secret holders and weaken the deterrent effect of contractual confidentiality obligations. The public interest disfavors that outcome.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's request for injunctive relief and issues a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), providing that: (1) ImageFIRST is prohibited from using, disclosing, or relying upon Cintas's trade secrets or confidential information; (2) ImageFIRST must return or destroy all Cintas materials and certify compliance; (3) ImageFIRST is prohibited from soliciting Cintas customers using Cintas confidential information; (4) ImageFIRST is prohibited from soliciting Cintas employees through

use of Cintas confidential information and through inducement of contractual breaches; and

(5) ImageFIRST must preserve all evidence relevant to this action.

Dated: May 15, 2026

/s/ *David Fioccola*
David Fioccola (*pro hac vice*)
Craig Whitney (*pro hac vice*)
Emily Kline (*pro hac vice*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dfioccola@proskauer.com
cwhitney@proskauer.com
ekline@proskauer.com

Stephen R. Chuk
PROSKAUER ROSE LLP
10001 Pennsylvania Ave NW
Suite 600 South
Washington, DC 20004
(202) 416-6800
schuk@proskauer.com

Gregory Knopp (*pro hac vice*)
PROSKAUER ROSE LLP
2029 Century Park East
Suite 2400
Los Angeles, CA 90067
(310) 557-2900
gknopp@proskauer.com

*Attorneys for Cintas Corporation*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Plaintiff's Proposed Findings of Fact and Conclusions of Law was electronically filed on this 15th day of May, 2026 through the CM/ECF system, which will send a notification of such filing to all counsel of record.

**PROSKAUER ROSE LLP**

/s/  *David Fioccola*

David Fioccola (*admitted pro hac vice*)
Craig Whitney (*admitted pro hac vice*)
Emily Kline (*admitted pro hac vice*)
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
Tel: 212 969 3000
Email: dfioccola@proskauer.com
Email: cwhitney@proskauer.com
Email: ekline@proskauer.com

Gregory Knopp (*admitted pro hac vice*)
Proskauer Rose LLP
2029 Century Park East
Suite 2400
Los Angeles, CA 90067
Tel: 310 557 2900
Email: gknopp@proskauer.com

Stephen R. Chuk
10001 Pennsylvania Ave NW
Suite 600 South
Washington, DC 20004
Tel: 202 416 6800
Email: schuk@proskauer.com

***Attorneys for Plaintiff***
***Cintas Corporation***